Argued and submitted April 18, affirmed September 26, 2012

In the Matter of the Marriage of

Cynthia R. MORTON,
*Petitioner-Respondent,*
*and*

Ronald E. MORTON,
*Respondent-Appellant.*

Washington County Circuit Court
C091952DRA; A146005

287 P3d 1227

Daniel S. Margolin argued the cause for appellant. With him on the briefs was Stephens Margolin PC.

Laura Graser argued the cause and filed the brief for respondent.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

HADLOCK, J.

**HADLOCK, J.**

Husband appeals a judgment of dissolution, challenging the trial court's spousal support award to wife and its division of the parties' property and debts. We reject his challenge to the spousal support award without discussion and write only to address the division of the property and debts. We conclude that the trial court acted within its discretion in making the division and therefore affirm.

At the outset, we address the scope of our review. Husband asks that we exercise our discretion under ORS 19.415(3) to review the record *de novo*. We decline to do so. *See* ORAP 5.40(8)(c) ("The Court of Appeals will exercise its discretion to try the cause anew on the record or to make one or more factual findings anew on the record only in exceptional cases. Consistently with that presumption against the exercise of discretion, requests [for *de novo* review] are disfavored."). Therefore, we are bound by the trial court's express and implicit factual findings if they are supported by any evidence in the record, and we state the facts consistently with that standard.[1] *Sconce and Sweet*, 249 Or App 152, 153, 274 P3d 303, *rev den*, 352 Or 341 (2012).

The parties were married in 1995. The dissolution petition was filed in 2009. At the time of trial, in 2010, husband was 63 years old and wife was 48. The parties have no children together, though husband has two adult children from a previous marriage. Shortly after the parties married,

---

[1] Husband asserts that, if we do not exercise *de novo* review, we should review for errors of law, viewing the evidence in the light most favorable to husband. That is not the standard by which we review the facts in a case in this procedural posture. Husband cites *Dillard and Dillard*, 179 Or App 24, 39 P3d 230, *rev den*, 334 Or 491 (2002), and *Castro and Castro*, 51 Or App 707, 626 P2d 950 (1981), two cases involving a father's motion to modify child custody. In both cases, the trial court granted the wife's motion to dismiss for insufficient evidence at the close of the father's case. On appeal, we reviewed to determine whether the father had presented a *prima facie* case, viewing the evidence in the light most favorable to him. *Dillard*, 179 Or App at 26; *Castro*, 51 Or App at 713-14. Here, the trial court entered judgment after hearing all of the evidence. Given that we are not reviewing a dismissal for failure to establish a *prima facie* case, but to determine whether the court's findings are supported by the record and whether the court abused its discretion in light of its findings, we view the facts as found by that court, supplemented with uncontroverted information from the record. *Kirkpatrick and Kirkpatrick*, 248 Or App 539, 541, 273 P3d 361 (2012).

they purchased a home on Kiowa Court in Tualatin. Both parties are in good health physically, but wife has mental-health difficulties. At the time of trial, wife had been seeing a psychiatrist, Dr. Stark, for nine years. According to Stark, wife has a high IQ, but he diagnosed her with Asperger's Syndrome, type-II bipolar disorder, attention deficit hyperactivity disorder, and mixed personality disorder. Stark gave wife a "global assessment of functioning" test, which psychiatrists use to determine whether a patient should receive inpatient or outpatient care. A score between 41 and 50 indicates "serious impairment in social, occupation, or school functioning"; a score below 41 supports giving inpatient treatment. Wife's score was 42. A vocational-rehabilitation consultant, Martin, evaluated wife before trial and described her as having "a difficult time engaging" by making eye contact, interacting, and answering questions by offering information beyond simply answering the question itself. According to Martin, wife had "no ability to actually offer emotion in conjunction with a situation. * * * [I]t was as though [wife] was programmed, as though she was like a parrot who could repeat the words and obviously had been taught socially appropriate behaviors, but was just going through miming them, in essence."

During the marriage, wife acted as the homemaker, doing roughly 85 percent of the housekeeping and yard work. She also worked from 1995 until 2006 as a transactions processor for a bank, earning $24,000 per year. Martin described wife's job as "four repetitive tasks that you do over and over and over again. It's sort of—it's copying, matching, copying, matching kind of basic, basic activities." Wife did the same job, without promotion, for 11 years. In 2006, the bank closed the department that wife worked in and terminated her position. Shortly thereafter, the bank gave her another position, but she was unable to master the skills of the new job and was fired after four weeks. Wife has not worked outside the home since then. According to Martin, wife would need vocational rehabilitation services to have "any hope and chance of getting a job" and would be limited to minimum-wage work.

Throughout the marriage, husband worked as a lumber broker and was paid strictly on commissions. From

2004 to 2007, he earned over $150,000 per year. When the housing market began to suffer in 2008, his income decreased to less than $44,000, and the next year it decreased again to just over $16,000. Beginning in early 2008, husband's income came in part from taking draws against future earnings. At the time of trial, husband's income had not rebounded, and he owed his employer approximately $13,700 for draws he had taken.

Husband managed the parties' finances during the marriage. When wife was working, she testified, husband "did allow [her] to spend [her] own paycheck" for personal expenses. At some point, wife developed a spending problem. According to husband, wife's spending exceeded her income by thousands of dollars a month because she "would spend a lot of money on massages and a lot of money on pampering herself, facials, [and c]lothes * * *."

Wife's father died in December 2003, leaving a substantial estate. He did not have a will, so the estate went into probate, and wife and her two siblings inherited it through intestate succession. The estate consisted of securities, cash, three apartment complexes, and the home that wife's father and stepmother had lived in. Wife's brother, Wall, served as the personal representative for the estate. The estate was not distributed until February 2008 because of uncertainty about how to distribute it. Ultimately, wife received title to one of the apartment complexes and some of the other assets.[2] The total value of her inheritance was nearly $1.25 million.

While the probate was pending, Wall generally dealt with husband, rather than wife, regarding the estate because husband had a better grasp of the matter. Wife hired an attorney, West, to help with the distribution, and he generally dealt with husband as well. Over the course of many phone calls and e-mail exchanges with Wall and West, husband helped to negotiate an agreeable distribution.

---

[2] Wife also received a one-third share in one of the other apartment buildings, but the siblings sold the building, and each took one-third of the proceeds in cash. Ultimately, wife received approximately $758,000 in cash and securities in addition to the apartment building, valued at $488,800, to which she took sole title. She also received a one-third interest in her father's house, subject to a life estate for her stepmother.

The apartment complexes had been appraised early in the proceeding, but once a general agreement had been reached on how the property would be distributed, both husband and wife's sister asked Wall for updated appraisals. The new appraisals saved the estate some $12,000 in taxes. Husband also persuaded Wall to reduce his fee for being the personal representative by $8,000.

As noted above, wife lost her job in 2006, while the probate was pending. Because the parties anticipated that wife would receive a substantial amount of money when her father's estate was distributed, husband agreed that wife did not need to seek a new job.

At some point, wife contacted West about forming a trust for the inheritance. West prepared a draft living trust for her, which she was to take to the parties' accountant. Wife instructed West not to tell husband about the trust until it was executed and ready to be funded, because she thought husband would object and that keeping it from him until then would minimize the arguments that might result. For reasons not disclosed in the record, wife ultimately did not pursue the trust.

Shortly after the estate was distributed, the parties sold the apartment complex that wife had inherited. Wife's intention was to use the proceeds of the sale to buy a nicer apartment complex. Husband persuaded wife to wait for a year to make that purchase, by which time, he said, their stock holdings would have appreciated significantly in value, allowing them to buy a much nicer complex. Husband later learned that, to avoid paying capital-gains taxes on the sold property by making a "1031 exchange" for another commercial property, paperwork for the exchange had to be filed before the property was even listed for sale. Because the paperwork had not been filed, the parties incurred approximately $112,000 in capital-gains taxes on the sale of the inherited apartment complex.

As it turned out, the parties did not buy another apartment complex. Around the time that the inherited complex was sold, husband deposited $700,000 of the

inheritance into his trading account and invested it in stocks. Over the course of the next two years, the stocks lost approximately $180,000 in value. During the same period, husband transferred $493,000 from the trading account into, at first, the parties' joint checking account and, beginning in March 2009, an account in husband's name only.

As noted above, husband's income began to decline sharply around the same time that wife received the inheritance, and both parties relied on the inheritance money to maintain, and even enhance, their lifestyle. Indeed, both spent inheritance money quite freely. Some of the money was used to pay off previous debts, but much of it was spent on entertainment, travel, elective surgeries and cosmetic procedures, furniture, clothing, a motorcycle, gifts for family members, and the like. As the trial court found, before wife received the inheritance, the parties' net income allowed them to spend an average of about $8,000 per month; during the two years between receiving the inheritance and the dissolution trial, their combined spending averaged more than $20,000 per month.

The parties' single biggest expenditure was a new house. In 2008, after they sold the apartment complex, husband believed that the housing market had dropped as low as it would go. Wife initially resisted buying a new house because she did not want to move, but husband persuaded her that a new home would be a good investment and that, if she made a down payment of $300,000, she would be reimbursed when they sold their Kiowa Court home. Wife agreed, and they bought a home on Cottonwood Street for $640,000, using $300,000 of inheritance money for the down payment. The parties did not sell the Kiowa Court house, but instead rented it out.

In March 2009, husband told wife that he wanted a divorce. Wife filed the dissolution petition two months later, but the parties continued to live together at the Cottonwood Street house until September 2009, when husband moved into the Kiowa Court house. The dissolution trial took place in April 2010. At that point, only about one-third of wife's inheritance remained unspent.

Before trial, West was appointed as wife's guardian *ad litem* to assist her in preparing her uniform support affidavit. He also established a budget for her, which helped her avoid overdraft and other charges that she previously had regularly incurred.[3]

At trial, one of the court's tasks was to divide the parties' property. ORS 107.105(1)(f) provides that the court in a dissolution action is to divide the parties' real and personal property "as may be just and proper in all the circumstances." Property subject to division falls into two classes. The first, referred to as "marital property," consists of any property that the parties possess, regardless of when it was acquired. *Kunze and Kunze*, 337 Or 122, 133, 92 P3d 100 (2004). The second class, "marital assets," is a subset of "marital property" and consists of property acquired during the marriage. *Id.* There is a rebuttable presumption that both spouses contributed equally to the acquisition of marital assets. *Id.* A party seeking to overcome the presumption of equal contribution has the burden of proving by a preponderance of the evidence that the other spouse did not contribute equally to the acquisition of the disputed property. *Id.* at 134.

Consistently with its task of dividing the parties' property, the court heard evidence with respect to, among other things, the presumption of equal contribution under ORS 107.105(1)(f). Wife's brother, Wall, testified about their father's donative intent. The following exchange took place during Wall's direct examination:

"Q Okay. And, knowing your father, do you have an opinion as to whether he intended to benefit any of [the] spouses of his children?

"A No.

"Q You don't know, or—

"A I—he never told me that he wanted [or] expected that the spouses benefit from his estate."

On cross-examination, Wall testified as follows:

---

[3] From June to December 2009, wife incurred more than $750 in overdraft charges and late-payment and other fees.

"Q *** [D]id your father ever tell you that he did not intend spouses to receive any of the funds?

"A No.

"Q So he never told you that he—he never said one way or another?

"A No."

The court also received in evidence a copy of a prenuptial agreement that wife's father and stepmother had entered into, in which both acknowledged that they had children by prior marriages and renounced any right to each other's property, whether acquired before or during their marriage.

After hearing all of the evidence, the court ruled that wife had rebutted the statutory presumption of equal contribution with respect to her inheritance. It found that wife's father had intended to benefit his children only, not their spouses. The court also determined that the prenuptial agreement "indicated that there was an intent to keep the property of [wife's father and stepmother] separate and benefit their separate children separately." In addition, the court made findings about the possible intent of wife's father, who had been a certified public accountant:

> "[Wife's father] may well have intended to die intestate, knowing that it would go by way of intestate succession, and knowing exactly what that would mean. A person of his sophistication *** [would] be aware that if Wife predeceased Husband, Husband was out. He would only be a beneficiary of the estate if he was named in a will ***."

In addition to making those findings concerning wife's father's donative intent, the court also found that, although husband had assisted in the distribution of the inheritance, he had not contributed to its acquisition, given that wife received it by operation of law. To the extent that husband's efforts increased the amount of wife's inheritance, the court concluded, he "has been compensated quite handsomely."

The court went on to consider whether wife had commingled the inheritance in the marital estate. It noted that inheritance funds had been used to pay off a home equity loan against the Kiowa Court house and a loan against husband's 401(k) retirement account. The court ruled that

those assets were sufficiently commingled in the marital estate that it would not "attempt[ ] to trace and 'back out' Wife's contribution from her inheritance." However, it identified several other assets that it found to be directly traceable to the inheritance, including the equity in the Cottonwood Street house, what remained of the securities that wife had inherited and of the stocks in husband's trading account, some cash, and a few personal items. With one exception, the court awarded those assets to wife and did not count them in determining an equitable division of the marital estate.[4] Those assets had a total value of $453,596. The court also designated as "non-marital" the $13,700 debt to husband's employer and a $24,252 promissory note to wife's mother for money that her mother had given her to help with living expenses after the parties separated. The court assigned the debt to husband's employer to husband and the note to wife's mother to wife, and it did not include either amount in calculating the division of the remaining property.

With respect to the remaining property and debts, which had a total net value of $592,497, the court concluded that equal division was appropriate. The value of the property that husband received was more than half of that total, so the court gave wife an equalizing award of $122,170. In the end, it gave wife a net award of $749,844.50 and husband a net award of $296,248.50. In the court's view, the difference in the awards was justified by the disparities in the parties' ages and employability. It noted that husband was healthy and capable of rebuilding his income to its former level and, in all events, was within a few years of Social Security retirement age. Wife's circumstances were significantly different. The court found that wife, who was 48 at the time of trial, was unlikely to be able to earn a living wage, given her disabilities, and therefore would need to rely on her inheritance for support. The court ordered that wife's award be placed in a trust, named a trustee, and ordered West to continue serving as wife's guardian *ad litem* until the trust was in place. The court also awarded wife monthly spousal support in the amount of $600 plus 30 percent of husband's

---

[4] The court found that a motorcycle that husband had purchased was traceable directly to wife's inheritance, and it designated that as a "non-marital" asset but awarded it to husband.

monthly gross income in excess of $2,500. The court entered a general judgment reflecting its property and support awards.

On appeal, husband raises three assignments of error related to the trial court's division of the parties' property and debts. We begin with his contention that the trial court erred in finding that wife had rebutted the presumption of equal contribution with respect to her inheritance. A party may rebut the presumption of equal contribution with evidence that the other spouse's efforts during the marriage did not contribute equally to the acquisition of the disputed marital asset. *Kunze*, 337 Or at 134. In the context of an inheritance, the presumption may be overcome by showing that the inheritance was "uninfluenced by the other spouse." *Jenks and Jenks*, 294 Or 236, 241, 656 P2d 286 (1982). "If one spouse can establish that the marital asset was acquired by gift and that the other spouse neither contributed to its acquisition nor was the object of the donative intent, then the statutory presumption is rebutted." *Tsukamaki and Tsukamaki*, 199 Or App 577, 583, 112 P3d 416 (2005). Husband argues that wife did not prove that she was the sole object of her father's donative intent. He also contends that he contributed to the acquisition of the inheritance.

With respect to the first point, husband argues that *Finear and Finear*, 240 Or App 755, 762-63, 247 P3d 1238 (2011), *rev dismissed*, 351 Or 580 (2012), stands for the proposition that there is no donative intent where an inheritance comes to a spouse through intestate succession. Husband reads too much into our opinion in that case. In *Finear*, the husband's uncle had left his entire estate to his parents and then to the husband's father. *Id.* at 758. The named devisees predeceased the uncle, so the estate passed by intestate succession to the husband and his two siblings. We noted that neither the husband nor the wife had "influenced the inheritance; it came to [the] husband not because of the testator's donative intent, but by operation of law." *Id.* at 762. However, we did not hold that intestate succession and donative intent are mutually exclusive, as a matter of law. Donative intent could be established if, as the trial court found in this case, the donor understood how

intestate succession operates and intended for his or her property to pass exclusively to the statutory heirs.

Husband argues that the record in this case does not support that kind of determination, that is, the court's finding that wife's father intended for his property to pass to his children only, and not to their spouses. Husband contends that the court misinterpreted Wall's testimony. As noted above, Wall testified as follows:

"Q   Okay. And, knowing your father, do you have an opinion as to whether he intended to benefit any of [the] spouses of his children?

"A   No.

"Q   You don't know, or—

"A   I—he never told me that he wanted [or] expected that the spouses benefit from his estate."

The court expressly found that Wall "testified that he did not believe that [his father] intended to benefit his children-in-law." According to husband, when he answered "No" to the first question, Wall actually meant that he had no belief as to whether or not his father intended to benefit his children's spouses.

In our view, the trial court's inference—that Wall meant that wife's father did not intend to benefit his children's spouses—was reasonable. Given our standard of review, we are bound by that inference. *Illingworth v. Bushong*, 297 Or 675, 694, 688 P2d 379 (1984) ("[A]n appellate court cannot reject the findings of fact of the trial court unless the appellate court can say affirmatively that there is no evidence to support the fact found by the trial court."); *Fugate v. Safeway Stores, Inc.*, 135 Or App 168, 171, 897 P2d 328 (1995) (the factfinder may draw reasonable inferences from the evidence). Furthermore, Wall's testimony as to his belief furnishes sufficient support for the court's finding that wife's father did not, in fact, intend to benefit his children's spouses. It follows that wife met the "donative intent" aspect of her burden in overcoming the presumption of equal contribution.[5]

---

[5] Even if we agreed with husband that the record does not support a finding that wife's father had *any* donative intent, the absence of donative intent would not aid husband. As we held in *Finear*, the absence of donative intent has the same significance as an intent not to benefit either spouse. 240 Or App at 762. If there is no intent to benefit *either* spouse, there is certainly no intent to benefit the

We conclude that wife met the other aspect of her burden as well—namely, to show that husband did not contribute to the acquisition of the inheritance. Husband cites his efforts in helping reach a settlement on the distribution of the inheritance as well as his efforts to increase its value by requesting reappraisal of the real property and a reduction in Wall's personal-representative fee. Husband misunderstands the nature of the "contribution" inquiry. "In order to show that a spouse contributed to the acquisition of inherited property, the contribution must have influenced the inheritance." *Olson and Olson*, 218 Or App 1, 9, 178 P3d 272 (2008). Husband's efforts after wife's father died may have resulted in some increase in the value of the inheritance, but they did not influence her father's decision to leave wife a portion of his estate. It follows that the trial court correctly determined that wife rebutted the presumption of equal contribution.

In his next assignment of error, husband contends that the trial court erred in failing to create a just and proper division of assets between the parties. He argues that the court erred both procedurally and substantively. Procedurally, husband contends that the court erred because it considered commingling only as part of the analysis of whether the presumption of equal contribution had been rebutted, not as an equitable consideration in the "just and proper" analysis. In fact, he appears to question whether the court engaged in the "just and proper" analysis at all. Substantively, husband contends that wife commingled her inheritance with the marital estate to such an extent that at least some of the assets derived from the inheritance should be divided equally.

We begin with husband's argument that the court's "just and proper" analysis was procedurally flawed. Husband correctly asserts that, when one party has separately acquired property, the court must consider commingling both in analyzing the presumption of equal contribution[6]

nonrelative spouse. Therefore, persuasive evidence that the donor had no donative intent satisfies the relative spouse's burden to show that the donor did not intend to benefit the nonrelative spouse. *Id.*

[6] Commingling bears on the outcome of the analysis of the presumption of equal contribution "only when an 'act of commingling may preclude the court

and in determining a "just and proper" distribution of all of the parties' property. *See Kunze*, 337 Or at 138 (discussing the circumstances under which commingling may preclude a court from reliably identifying one spouse's "separate contribution" of property); *id.* at 142 (commingling may affect the proper division of separately acquired assets when a spouse has so integrated a separately acquired asset into the joint finances of the marital partnership that it would be inequitable to award the asset to that spouse as separate property under a "just and proper" distribution of the parties' marital property).

In this case, the trial court did not explicitly state that it was conducting the "just and proper" analysis, but that was the substance of part of its oral rulings at the close of trial. The court noted, among other things, the age and employment disparities between the parties and the fact that wife would need to rely on the inheritance—factors in the "just and proper" analysis. *See id.* at 136 (the equitable considerations under ORS 107.105(1)(f) include "the achievement of economic self-sufficiency for both spouses" and "the particular needs of the parties"). Furthermore, the court's finding that the parties agreed that wife would rely on the inheritance indicates that the court considered commingling as part of its analysis: With respect to the "just and proper" analysis, commingling turns on the intent of the spouse who acquired the property, which courts discern by considering factors including "the degree of reliance upon the disputed property as a joint asset." *Id.* at 141.

In short, we reject husband's contention that the court failed to engage in the required analysis. Although the court's written analysis in this case was perhaps more spare than husband would have preferred, the record adequately demonstrates that the court exercised its discretion under the correct analytical method. *See Olson*, 218 Or App at 16 ("In order to earn the measure of deference to which discretionary decisions are entitled on appeal, a trial court's property award must reflect the exercise of discretion under

from identifying that spouse's separate contribution with sufficient reliability to rebut the statutory presumption * * *.'" *Tsukamaki*, 199 Or App at 584 (quoting *Kunze*, 337 Or at 138). Husband does not contend that the trial court erred in its consideration of commingling at the "presumption" stage.

the correct methodology, and it must lie within the range of legally permissible outcomes."). The court did not err procedurally.

Substantively, the court's treatment of the inheritance fell within the range of permissible outcomes; in other words, the court did not abuse its discretion in dividing the inheritance-derived assets as it did. *See Kunze*, 337 Or at 136 ("The trial court's ultimate determination as to what property division is 'just and proper in all the circumstances' is a matter of discretion."). As part of the "just and proper" analysis, commingling turns on the intent of the spouse who inherited or otherwise acquired disputed property, which we discern by considering factors including "(1) whether the disputed property was jointly or separately held; (2) whether the parties shared control over the disputed property; and (3) the degree of reliance upon the disputed property as a joint asset." *Id.* at 141. As husband points out, the trial court did not make any express findings as to whether any of the funds or property derived from the inheritance had been commingled. Husband also points out that much of the evidence would support a finding that most, if not all, of the inheritance was commingled with the rest of the parties' assets. For example, he notes that the Cottonwood Street property was jointly titled, that both parties had possession and control of the house, and that they used it as the marital residence.

We need not attempt to determine whether the trial court implicitly found that the inheritance was commingled or not, or whether any evidence would support a finding that it was not commingled. In our view, whether the inheritance was commingled is not dispositive under the circumstances. As the Supreme Court cautioned in *Kunze*,

"acts of commingling do not mandate in all cases the inclusion of separately acquired property in the property division. Instead, the court must evaluate the extent to which a spouse has integrated a separately acquired asset into the joint finances of the marital partnership *and also evaluate whether any inequity would result from the award of that asset to that spouse as separate property.*"

*Id.* at 142 (emphasis added). Although the emphasized part of that statement focused on whether awarding property to one spouse separately would be inequitable, we think it equally necessary for a court to evaluate whether *dividing* an asset would result in inequity.

In this case, we conclude that, notwithstanding that substantial portions of wife's inheritance may have been commingled with the parties' other assets, the trial court acted within its discretion in determining that it was equitable to award what remained of the inheritance to wife. Wife undoubtedly needs those assets for her financial support. *See id.* at 136 (the equitable considerations in the "just and proper" analysis include "the achievement of economic self-sufficiency for both spouses" and "the particular needs of the parties"). She has essentially no income-earning capacity and is many years away from retirement, whereas husband is capable of earning money and is reasonably close to retirement age, at which point he will have access to retirement income. Given those circumstances, the trial court did not abuse its discretion in awarding the inheritance-derived funds and assets to wife. *Cf. Powell and Powell*, 225 Or App 402, 406, 202 P3d 183 (2009) (award of the long half of the marital assets to the wife was equitable in light of the wife's physical disability and her need, based on her limited income, for a place to live). We reject husband's argument to the contrary.

We turn to husband's remaining assignment of error, in which he contends that the trial court erred in not treating his debt to his employer as a marital debt subject to equal division. Husband argues that the debt resulted from draws that he took for income as his commissions declined and that the income was used to support the parties. Accordingly, he contends, the court should have made each party responsible for half of the debt.

Wife responds that the "amount and nature of this debt was a moving target at trial." She points out that, before trial, husband provided a document showing that the debt was $18,780; that he testified at trial that it was $2,000 or $3,000 less than that; and that his employer's comptroller testified that the debt was actually $13,700. Wife urges us to infer that the trial court had doubts about whether the debt

was real. Wife also notes that the court ordered her to pay the $24,252 debt to her mother, which, wife asserts, was also incurred during the marriage. Wife argues that, if "husband's possibly phantom debt to his employer is a marital debt, so is wife's debt to an elderly family member." She goes on to argue that, in the broader context of the parties' respective financial circumstances and husband's role in spending her inheritance, it is equitable to order husband to pay the debt to his employer.

As part of the undertaking to divide the parties' property, "a court may divide the debts that the parties incurred during their marriage." *Shlitter and Shlitter*, 188 Or App 277, 283, 71 P3d 154 (2003) (citation omitted). For purposes of division, there is a distinction between marital debts and debts owed by only one of the parties. In determining the nature of a debt, courts "focus not on the person in whose name the [debt was incurred], but on the use to which it was put." *Branscomb and Branscomb*, 201 Or App 188, 202, 117 P3d 1051, *rev den*, 339 Or 544 (2005). If the debt was incurred to pay family expenses, equal division of the debt is generally appropriate. If, on the other hand, the debt is properly attributed to only one of the parties, the debt should generally remain that party's responsibility. *Id.* at 203. However, "[a]s with assets acquired during the marriage, the debts must be divided equitably," *Shlitter*, 188 Or App at 283, and the parties' circumstances may require a division of debts that departs from what is generally appropriate.

We reject wife's assertion that the trial court had doubts about whether the debt to husband's employer was real. Indeed, the court stated that the manner in which husband was compensated—including owing a debt for past draws—was consistent with its understanding of his trade. Nor can we infer that the court equated that debt with the money that wife received from her mother. Wife herself testified that the promissory notes to her mother did not reflect a real debt, because the money was being treated as a gift.

We also reject wife's contention that husband's role in spending much of her inheritance should bear on the equitable division of husband's debt to his employer. One

party's spending habits may be taken into account if the spending amounts to waste or misappropriation of marital assets, *Wolhaupter-Heinzel and Heinzel,* 108 Or App 514, 519, 816 P2d 672, *rev den,* 312 Or 526 (1991), but the trial court stopped short of finding waste,[7] and wife does not contend on appeal that husband wasted or misappropriated inheritance funds or other assets.

Nevertheless, we agree with wife that, in the broader context of the parties' respective financial circumstances, the trial court reasonably could find it equitable to order husband to pay the debt to his employer. The trial court expressed concern that the property award to wife would not be enough for her to survive without spousal support. Given that the support award is tied to husband's income, which was very low at the time of trial, the amount of support was also likely to be relatively low at the outset, prompting the court to observe that, in the short term, wife "may need to use more of the [property] award for her present expenses * * *." In other words, the court was concerned that, at least initially, the property award would not be sufficient to assure wife's economic self-sufficiency, even taking into account the award of spousal support. *See Kunze,* 337 Or at 136 (the economic self-sufficiency of both spouses is one of the equitable considerations in a "just and proper" division of property). Assigning half of the debt to husband's employer to wife would only have made her position more precarious. In light of the court's concern, which is supported by the record, the court acted within its discretion in making husband solely responsible for the debt.

Affirmed.

---

[7] The court stated that "this is a devastatingly bad financial history over a very brief period of time, really coming very close to the argument of marital waste, which is, frankly, highly disfavored, but it's awfully close to that."