Argued and submitted July 2, awards of child support and spousal support reversed and remanded; otherwise affirmed September 25, 2013

In the Matter of the Marriage of

Kaarin Beth ANDERSEN,
nka Kaarin Beth Powell,
*Petitioner-Respondent,*
*and*

Steven Craig ANDERSEN,
*Respondent-Appellant.*

Clackamas County Circuit Court
DR11060152; A151241

310 P3d 1171

Helen C. Tompkins argued the cause and filed the briefs for appellant.

Laura Graser argued the cause and filed the brief for respondent.

Before Sercombe, Presiding Judge, and Haselton, Chief Judge, and Hadlock, Judge.

HASELTON, C. J.

## HASELTON, C. J.

Husband appeals a general judgment of dissolution, challenging, *inter alia*, the trial court's awards of transitional and compensatory spousal support and child support. Husband contends, in part, that (1) the court erred in determining that wife was entitled to compensatory spousal support; and (2) in all events, the court erred in fixing the amount of transitional and compensatory spousal support and child support in that the court's finding as to his earning capacity was unsupported by legally sufficient evidence. We reject husband's first contention, but we agree with his second.[1] Accordingly, we reverse and remand the spousal and child support awards, and otherwise affirm.[2]

In this case, husband has not requested that we engage in *de novo* review, and we do not exercise our discretion to do so. ORS 19.415(3)(b); ORAP 5.40(8)(c). Accordingly, "we are bound by the trial court's express and implicit factual findings if they are supported by any evidence in the record." *Morton and Morton*, 252 Or App 525, 527, 287 P3d 1227 (2012). "We review the trial court's ultimate determination about a 'just and equitable' amount of support for abuse of discretion." *Bailey and Bailey*, 248 Or App 271, 275, 273 P3d 263 (2012). We will uphold a support award if, "given the findings of the trial court that are supported by the record, the court's determination that an award of support is 'just and equitable' represents a choice among legally correct alternatives." *Berg and Berg*, 250 Or App 1, 2, 279 P3d 286 (2012).

The historical facts of the parties' relationship are undisputed. Husband and wife married in 1991 while they were both undergraduate students working in service-industry jobs in Washington. After husband completed his undergraduate degree, he entered law school in California, and wife accompanied him.[3] Husband did not work during his first

---

[1] We reject without discussion husband's third and fourth assignments of error pertaining to the trial court's order that he obtain life insurance and the division of a tax refund.

[2] Wife moved to dismiss this matter for lack of appellate jurisdiction, and the Appellate Commissioner denied that motion. In her briefing, wife renews and reiterates that jurisdictional challenge, *see* ORAP 7.15(3), and we reject it without published discussion.

[3] Wife did not complete her bachelor's degree, but she later earned an associate's degree in general education in 1997.

year of law school, and wife worked as a receptionist. After that first year, husband worked as a paid law clerk in a law firm full time in the summers and nearly full time during his second and third years of law school. Wife continued to work as a receptionist during that time. Husband also took out student loans to pay for school and living expenses, which his mother eventually paid off.

Shortly after husband graduated from law school, the couple moved back to Washington where husband worked at a lumber company before moving through a series of jobs with law firms that focused on commercial, construction, and real estate litigation. In 2005, approximately 10 years into his legal career, husband started a solo practice in Vancouver focusing on construction litigation and real estate. From 2005 to 2011, wife worked for husband's law practice part time, and without pay, doing basic bookkeeping and data entry. She spent the majority of her time as homemaker, keeping the couple's house and rearing the parties' four children, who, at the time of trial, were ages 14, 13, 11, and 4.

Husband initially experienced financial success as a solo practitioner. According to wife, "when [husband] started his law firm, we were bringing home $10,000 a month just in paychecks, and we would spend it all. Anything that we wanted, we would go out and purchase." The parties purchased a five-bedroom home, multiple vehicles, and recreational equipment. However, as the economy entered a recession, the construction and real estate industry declined, and husband had difficulty procuring construction and real estate-related legal work. In addition, he had trouble collecting legal fees from the clients that he had already served. In the five years leading up to the dissolution, 2007 to 2011, husband's practice generated the following average net monthly incomes: $8,700; $7,700; $7,400; $2,200; and $2,300.

The parties separated in June 2010. They filed for bankruptcy that December, and the bankruptcy was finalized in February 2011. The parties subsequently lost their home in Washington to foreclosure. At the time of dissolution, the parties were living separately in the same community near Mt. Hood. Husband was living in a cabin that

his mother had given him and was commuting to his law office in Vancouver. At that time, and for the two preceding years, husband had been billing approximately two hours per working day.

At the time of dissolution, wife and children were living in a mobile home with some financial support from her parents. Wife was caring for the children full time and volunteering part time as a firefighter and first responder. She had not sought full-time employment because her limited education and job experience would only allow her to obtain a low-paying job in which the cost of childcare would exceed her wages. Wife had recently attended community college courses and planned to continue her education with hopes of beginning a career in the medical field.

In the dissolution petition, wife sought, as material here, transitional and compensatory spousal support and child support. ORS 107.105(1) governs entitlement to, and the amount of, such support. That statute provides, in pertinent part:

"Whenever the court renders a judgment of marital annulment, dissolution or separation, the court may provide in the judgment:

"* * * * *

"(c)   For the support of the children of the marriage by the parties. In ordering child support, the formula established under ORS 25.275 shall apply. * * *

"(d)   For spousal support, an amount of money for a period of time as may be just and equitable for one party to contribute to the other, in gross or in installments or both. * * * In making the spousal support order, the court shall designate one or more categories of spousal support and shall make findings of the relevant factors in the decision. The court may order:

"(A)   Transitional spousal support as needed for a party to attain education and training necessary to allow the party to prepare for reentry into the job market or for advancement therein. The factors to be considered by the court in awarding transitional spousal support include but are not limited to:

"(i)     The duration of the marriage;

"(ii)    A party's training and employment skills;

"(iii)   A party's work experience;

"(iv)    The financial needs and resources of each party;

"(v)     The tax consequences to each party;

"(vi)    A party's custodial and child support responsibilities; and

"(vii) Any other factors the court deems just and equitable.

"(B) Compensatory spousal support when there has been a significant financial or other contribution by one party to the education, training, vocational skills, career or earning capacity of the other party and when an order for compensatory spousal support is otherwise just and equitable in all of the circumstances. The factors to be considered by the court in awarding compensatory spousal support include but are not limited to:

"(i)     The amount, duration and nature of the contribution;

"(ii)    The duration of the marriage;

"(iii)   The relative earning capacity of the parties;

"(iv)    The extent to which the marital estate has already benefited from the contribution;

"(v)     The tax consequences to each party; and

"(vi) Any other factors the court deems just and equitable."

Central to the parties' dispute, and the trial court's determination as to the amount of spousal and child support, was husband's purported earning capacity. Husband presented testimony that, in the region where he practices law, southwest Washington, there had been a "precipitous decline" in employment related to the construction industry, and that many lawyers and other construction-industry professionals had filed for bankruptcy in the three years leading up to the dissolution proceeding. According to one vocational expert, "[w]hat the state's economists are projecting is that the numbers of individuals employed in the construction industry will

not reach pre-recession levels—the numbers that existed back in 2007—until approximately 2020." He clarified that he was "talking about the industry as a whole," and that other professions outside of and related to the construction industry "would be negatively impacted by the downturn in the construction industry." Additionally, a bankruptcy trustee and husband's former law firm colleague testified that husband has a strong work ethic and a good reputation in the legal community. Wife did not offer any evidence, including by way of expert testimony, contradicting husband's proof as to the very substantial decline in construction law-related matters, and the consequent decline in earnings of construction law specialists, in southwest Washington.

With respect to husband's level of employment, he testified that he billed approximately two hours per working day and spent the rest of the work day managing collections, answering calls from prospective clients, and contacting past and potential referral sources. Husband testified that his gross monthly income at the time of the dissolution hearing was $2,700. Husband also testified that, after his business declined, he inquired with other firms about possible employment opportunities. In particular, he stated that a large firm had shown some interest in bringing him into the practice, but withdrew its interest after deciding that the amount of business that husband would bring with him was insufficient.[4]

According to husband, his plan at the time of dissolution was to "wait it out" for up to three years (meaning that he would continue working minimal hours until the construction industry rebounded) or "try to pick up different areas of practice." However, husband explained that he was reluctant to enter unfamiliar practice areas because he was concerned with committing malpractice in light of his 16-year specialization in construction law and concomitant

---

[4] Specifically, husband testified:

"I've talked to a large law firm that has been courting me for [four] years. They asked me what my receipts or my origination was. I told them, 'About a hundred thousand dollars, hoping.' And they came back, and the managing partner of the Vancouver office that I spoke with said, 'Sorry, you've got to have $200,000, or we're not really interested.'"

inexperience in other areas of law. In light of his limited income, husband argued that he "simply just can't afford anything over a very minimal spousal support."

In addressing wife's request for spousal support, and husband's opposition to such support, the trial court stated:

"[T]he [husband's] position is, 'But I don't have any money right now, and I shouldn't pay.' I find that the reason the [husband] doesn't have any money right now is because he's not working as hard as he could and should and he's not been careful and farsighted about the alternative things he could do. It makes no sense to think that this individual will spend three years making $2,700 a month and be satisfied with that. I am not persuaded by the evidence in the record that that is as good as he can hope to do with 16 years litigation experience.

"I get that he's comfortable in his field. We don't get comfort. We need to take care of our family and our children. Finding that, even in today's times, if he was working as hard as he should—and he has proven he can and will—he could make at least $8,000 after his business expenses. And, therefore, I find that his capacity to earn, based upon—and I—and I find that he's intentionally under-working to manipulate the status here today. While I don't have any credibility issues, as such, I find him unpersuasive regarding his ability to work, and I've stated the reasons why."

The court explained that, "[b]elieving that [husband] is not working full time at his best capacity, then, I believe the law allows me to look at his capacity to earn."

The court subsequently entered a general judgment of dissolution, in which the court made the following findings:

"Evidence was presented that in years 2007, 2008, and 2009, [husband] earned, after his business expenses were deducted, between $89,000 and $103,850, while engaging in the same practice of law as he currently practices, and in the same location of Vancouver, Washington. He has the capacity to earn that level of income again.

"While there has been some decline in construction defect cases, [husband] has made no effort to expand his practice areas, and has made minimal effort to attract new clients.

"* * * * *

"[Husband] has made little effort to seek employment elsewhere, and little effort to supplement his income in other ways.

"[Husband] has no plan to improve his economic outlook, and is waiting for and hoping that his primary practice area will recover. His efforts have been shortsighted and inappropriate given the needs of the family.

"* * * * *

"While respondent's business-related expenses have reasonably decreased, his reported income of $2,700 per month is suspicious, and his testimony in that regard is not persuasive or credible. His testimony is otherwise credible.

"The court finds that [husband] is not working to his potential or working full time. *[Husband] has a gross monthly earning capacity of $8,000,* after deduction of his business expenses. His actual present income is lower."[5]

(Emphasis added.)

Ultimately, the trial court ordered husband to pay child support of $1,162 per month; medical support of $220 per month for the parties' children; transitional spousal support of $2,500 per month for 34 months; and compensatory spousal support of $1,000 per month for 10 years following the cessation of transitional support. Each of those awards was predicated on the court's determination that husband's present monthly earning capacity at the time of trial was $8,000.

On appeal, husband challenges the support awards, contending that the court erred in awarding *any* compensatory spousal support because wife did not establish that she had made a "significant financial or other contribution" to his "education, training, vocational skills, career or earning capacity." ORS 107.105(1)(d)(B). Husband also contends that, because the trial court's finding as to his earning capacity

---

[5] Although the trial court explicitly rejected, as "not persuasive or credible," husband's testimony that his actual monthly income was $2,700, wife did not offer any evidence contradicting that proof. In any event, the trial court did not make any finding as to the amount that husband's actual income was at the time of dissolution.

was unsupported by legally sufficient evidence, the trial court erred in its derivative determinations of the amounts of spousal support and child support awards.

We turn first to the propriety of the compensatory spousal support award. When an obligor spouse challenges an award of compensatory spousal support, the initial inquiry is whether the identified contributions from one spouse to another are "significant." ORS 107.105(1)(d)(B). In *Harris and Harris*, 349 Or 393, 402, 244 P3d 801 (2010), the Supreme Court explained that, "as long as the contributions of one spouse to the other are meaningful and are likely to have influence and effect, they come within the definitional scope of the statutory term 'significant.'" There, the court concluded that the wife's contributions—*viz.*, working full time to provide health insurance and financial support while the husband attended undergraduate and dental school, and working part time in the husband's dental practice for a period of seven years—"were 'significant contributions' to [the] husband's education and career sufficient to trigger consideration of a compensatory spousal support award." *Id.* at 408.

The husband in *Harris* argued, in the alternative, that, even if the court determined that the wife's contributions were sufficiently "significant" to establish entitlement to compensatory support, the marital estate had already benefited from the wife's contributions. *Id.* at 412; ORS 107.105(1)(d)(B)(iv). Specifically, the husband pointed to the value of his dental practice, which had been divided in the property division, and the fact that, "during the period after [the] husband began his dental practice until the marriage dissolved, the parties' lifestyle included a large home, luxury cars, expensive vacations, and a country club membership." *Harris*, 349 Or at 414. The Supreme Court explained that we concluded that the "wife's share of the marital assets and her participation in the lifestyle that the parties enjoyed during the 10 years preceding their dissolution offset the contributions [the] wife made to [the] husband's education, training, and career." *Id.* On review, the Supreme Court reversed our decision, explaining that, had the parties married "after he completed his dental degree (and consequently

she had not made the contributions she did to help him through the years it took for him to obtain his dental degree), [the] wife would almost certainly have received the same distribution of marital assets as she received here." 349 Or at 415. Accordingly, the court determined that "the significant asset distribution and financially comfortable lifestyle available to her do not disqualify [the] wife from an award of compensatory spousal support." *Id.*

We applied *Harris* in *Morrison and Morrison*, 240 Or App 656, 247 P3d 1281 (2011). In *Morrison*, the wife worked full time while the husband finished medical school. During that time, the wife's income was the "predominant" source of income for the couple. *Id.* at 658. After the parties had two children, and while the husband was completing his cardiology training, "the parties decided that [the] wife would not work outside the home. Instead, by mutual agreement, [the] wife maintained the family home and had primary child-care responsibilities." *Id.* at 659. The parties had two additional children and moved multiple times as the husband's career progressed, finally settling in southern Oregon where the wife continued homemaking and the husband practiced cardiology for eight years before the parties separated. *Id.* at 660.

Upon dissolution, the parties disputed spousal support. The dissolution court awarded the wife transitional and maintenance support, but refused to award compensatory support. *Id.* at 664. On appeal, the wife argued, among other things, that she was entitled to greater spousal support and that part of the support should be categorized as compensatory support.[6] *Id.* Applying the analysis set out in *Harris*, we first concluded that the wife's contributions were "significant" within the meaning of the statute. We reasoned:

"Here, wife's income was the predominant source of income for the parties as husband completed his final two years of medical school. Thereafter, while husband completed his

---

[6] We have observed that "a compensatory support award ordinarily is more secure." *Hook and Hook*, 238 Or App 172, 183, 242 P3d 697 (2010). That is so because modification of compensatory spousal support requires a distinct showing that modification of maintenance and transitional spousal support do not. *See* ORS 107.135(3)(a) ("[A]n order of compensatory spousal support may only be modified upon a showing of an involuntary, extraordinary and unanticipated change in circumstances that reduces the earning capacity of the paying spouse.").

three-year internship and residency, wife worked to supplement his modest income even after the birth of their two older children. Further, even though the parties eventually agreed that wife would leave the workforce to maintain the family home and assume primary child-care responsibilities, those contributions allowed husband to concentrate his attention on the completion of his cardiology training."

*Morrison*, 240 Or App at 669. We then determined that the factors listed in ORS 107.105(1)(d)(B) militated in favor of an award of compensatory support. *Id.* at 669-70.

Returning to this matter, husband contends that wife did not demonstrate that she had made "significant" contributions to his "education, training, vocational skills, career or earning capacity." Husband argues that *Harris* is factually distinguishable because, there, the wife worked full time from the beginning of the marriage until the husband graduated from dental school six years later, whereas, here, husband worked through law school, and wife provided no evidence as to whether she had worked full time or part time during that period of the parties' marriage. Husband further asserts that *Morrison* is distinguishable because, he claims, wife's support was not so significant that it allowed him to "concentrate his attention on the completion of his [legal] training." 240 Or App at 669.

Husband argues, in the alternative, that, even if we determine that wife's contribution was "significant," the remaining factors "to be considered by the court in awarding compensatory spousal support" weigh against such an award. Specifically, husband contends that "the marital estate has already benefited" from wife's contribution in that, during the years that husband's law practice prospered, the family enjoyed the benefits of husband's enhanced earning capacity by occupying a five-bedroom home and spending freely. ORS 107.105(1)(d)(B)(iv).

Applying the principles expressed in *Harris* and *Morrison* to the circumstances of this case, we conclude that the trial court did not err in awarding compensatory support. We note, first, that the factual differences that husband emphasizes between this case and those are, at most, matters of marginal degree and not kind—and, thus, are not

the basis of substantive legal distinction. Here, wife handled the majority of the parties' domestic responsibilities, including keeping the home and raising the parties' four children, thereby allowing husband time and energy to establish his law practice. *Accord English and English*, 223 Or App 196, 209, 194 P3d 887 (2008) (upholding an award of compensatory spousal support because "wife's maintenance of the marital home and responsibility as the primary custodial parent to the parties' two children for 11 years, as well as her homemaker contribution in the years before the separation, allowed husband to advance his career"). Furthermore, wife contributed to husband's career by working for his practice for nearly seven years, performing data entry and bookkeeping without pay. *See Harris*, 349 Or at 408 (concluding that the wife's contributions were "significant contributions" to the husband's education and career, in part, because the wife worked part time in the husband's dental practice for seven years). Additionally, wife produced some income as a receptionist and, presumably, provided domestic support while husband was in law school. *Accord Austin and Austin*, 191 Or App 307, 321, 82 P3d 170 (2003) (upholding an award of compensatory spousal support where wife supported husband's education and career by assuming primary responsibility for the parties' home and children and working part time as a housecleaner and school bus driver). Given the circumstances, the trial court could properly determine that wife's contributions were "meaningful" and "likely to have influence and effect" on husband's education, training, vocational skills, career, or earning capacity. *Harris*, 349 Or at 402.

Nor—contrary to husband's alternative contention—does the fact that the contributing spouse has historically benefited from his or her contribution categorically preclude that spouse's entitlement to compensatory spousal support. Rather, as the court explained in *Harris*:

> "Although it may be an overstatement to categorize the parties' positions in absolute terms, we view husband's position to be something akin to asserting that, if the parties have accumulated substantial assets and enjoyed a luxurious lifestyle during the marriage, then no compensatory support should be granted. And we understand wife's position to

be that the contributing spouse should be awarded compensatory spousal support in an amount that will fully realize all the benefits that the spouse would have obtained had the marriage lasted throughout the other spouse's entire earning career. In our view, the correct answer lies somewhere in between."

349 Or at 414; *see also Morrison*, 240 Or App at 670 (applying that "in-between" notion in awarding compensatory support).

The circumstances of this case, like those in *Harris*, fall within the "somewhere in between." Unlike the circumstances in *Harris*, as a result of bankruptcy and foreclosure, wife's portion of the marital property distribution was not substantial. Similarly to the circumstances in *Harris*, the fact that wife enjoyed some benefits that resulted from husband's enhanced earning capacity for a number of years during their 20-year marriage did not "offset completely the contributions wife made to husband's education, career, and enhanced earning capacity." 349 Or at 415. Certainly, wife is entitled to some amount of compensatory support for her significant contributions described in detail above—*viz.*, working while husband completed his education, bearing primary childcare and household responsibilities for over 14 years, and working part time in husband's law practice for nearly seven years. We conclude that the trial court did not err in awarding compensatory support.

Having determined that the trial court did not err in awarding compensatory spousal support, we proceed to husband's contention that the trial court erred in setting the amounts of transitional and compensatory spousal support and child support awards in the dissolution judgment. As noted, husband's predominant contention is that the trial court's finding that his monthly earning capacity was $8,000 was unsupported by legally sufficient evidence and, thus, the court erred in fixing the amount of transitional and compensatory spousal support and child support. Wife responds that the $8,000 figure is supported by evidence of husband's prior earnings. Wife also notes that "the court found that if [husband] put a sincere effort into raising his income, he could do so, immediately." Wife contends that that latter finding is supported by "husband's history of success,

his reputation as a good, hardworking lawyer, his demeanor, and the observation of human nature that the income of divorcing obligors sometimes goes down by the time of trial."

Husband invokes *Hendgen and Hendgen*, 242 Or App 242, 248, 255 P3d 551 (2011), where, on *de novo* review, we explained that, although a support amount may be predicated on the obligor's potential income, as opposed to actual income, a support award must, nevertheless, be set in an amount that the obligor has the present ability to pay at the time of dissolution. *See also Waterman and Waterman*, 158 Or App 267, 271, 974 P2d 256 (1999) ("[W]hen there is evidence in the record of the husband's actual income, it is incumbent upon the wife as the proponent of a higher income figure to demonstrate husband's present ability to pay spousal support based on the higher amount.").

In *Hendgen*, the parties were both self-employed real estate investors. In the years before the dissolution of their marriage in 2006, the parties' investments had been profitable, but their income was declining. The parties' annual incomes from 2003 to 2006 were $474,531; $436,927; $234,514; and $149,218. 242 Or App at 245. At the time of dissolution, the husband offered evidence that, because of the downturn in the real estate market, the parties were unlikely to profit from their holdings, with the exception of one income-producing property in Alabama that generated an annual net income of approximately $150,000, and the parties' small residential farm that earned approximately $25,000 per year. *Id.* As to the parties' future incomes or earning capacities, the trial court found that, "despite the current slowdown in the real estate market, [the] husband's earning potential 'is substantially in excess' of [the] wife's"; accordingly, the trial court awarded the wife monthly maintenance support in the amount of $4,000 without explaining how it arrived at that amount. *Id.* at 246.

The husband appealed, asserting that the court erred in awarding spousal support, in part, because the wife did not establish that he had the ability to pay $4,000 each month. *Id.* at 247. The wife remonstrated that "the trial court could make an award of spousal support based on past income and [the] husband's earning capacity." *Id.* (citing

*Christensen and Christensen,* 123 Or App 412, 415, 859 P2d 1192 (1993)). Specifically, the wife asserted that, "in order to determine [the] husband's potential earning capacity, one need only take an average of the parties' incomes during the four years immediately preceding the dissolution." *Id.* at 249.

On *de novo* review, we concluded that the parties' circumstances established the wife's entitlement to indefinite maintenance spousal support. In that regard, we determined that the evidence established (as the trial court had found) that the husband's earning capacity was greater than the wife's, and that his post-dissolution income was likely to increase.

However—and critically to our analysis here—we further concluded that the evidence in the record was insufficient to establish the husband's earning capacity and, thus, derivatively, the amount ($4,000 per month) of the maintenance support awarded. Specifically, we observed that, "[o]ther than [the Alabama and farm incomes] and the history of the parties' earnings in the four years before trial, there is no evidence in the record concerning [the] husband's future income," and that, on that record, "it would be pure speculation to place a dollar figure on what that additional income might be. Even assuming [the] husband's greater earning capacity, support cannot be determined in the absence of evidence of what that earning capacity might be." *Hendgen,* 242 Or App at 245, 250. We further emphasized that evidence of the parties' past income, alone, was insufficient to demonstrate the husband's present income potential and ability to pay, particularly when there was evidence in the record that economic factors in the husband's area of work had diminished his earning capability. Accordingly, we concluded that "an award of support of $4,000 in addition to the property division was purely speculative, far exceeds [the] husband's ability to pay, and was not just and equitable." *Id.* at 251. We modified the judgment to provide for indefinite maintenance spousal support of $400 per month, an amount that we determined was within the husband's established ability to pay.[7]

---

[7] We also observed that, "[s]hould the parties' earning capacities become less speculative in the future, that could constitute a substantial change in circumstances justifying a reconsideration of spousal support." *Hendgen,* 242 Or App at 251.

Here, husband argues that, like the spousal support award in *Hendgen,* the support awards here were "purely speculative" and exceed his established ability to pay. Wife attempts to distinguish *Hendgen* and *Waterman* by first noting that we reviewed those cases *de novo,* and then reiterating that, here, the evidence demonstrates that husband had, historically, earned up to $8,000 per month, and that the trial court disbelieved husband's assertions that he could not make more than his reported current monthly income of $2,700. Specifically, although wife acknowledges that "the economy has weakened, and husband's particular field is in a particularly weak sector," she emphasizes that "the court found that if he put a sincere effort into raising his income, he could do so, immediately."

We agree with husband that, notwithstanding that *Hendgen* and *Waterman* arose in a posture of *de novo* factual review, the *legal* principles that informed our analysis in those cases are applicable and dispositive here. In particular, those cases establish, as a matter of law, that (1) if one spouse contends that the other's earning capacity exceeds his or her actual income as established at trial, the former bears the burden of establishing that fact and (2) that burden can be sustained only by reference to nonspeculative evidence of *present* earning capacity, and mere reliance on attenuated earning history is legally insufficient.

Here, the trial court's attribution to husband of a present earning capacity of $8,000 a month does not comport with those constraints. Specifically, given the uncontroverted circumstances at the time of dissolution—*viz.,* the downturn in the construction and legal services industries—the evidence that husband had earned a higher income in the past and that he is a reputable lawyer, was, without more, legally insufficient to support a nonspeculative finding that, at the time of dissolution, husband was capable of earning $8,000 per month. In that regard, we note that we have been unable to discern—and wife has not identified—any evidence that supports the court's finding that, at the time of dissolution, husband was "not working to his potential" to such a degree that he could, and should, otherwise have been earning $8,000 a month. Indeed, husband

presented uncontroverted evidence that demonstrated that the market for his skills had diminished greatly and that his actual monthly income at the time of dissolution was approximately $2,700. Further, even assuming that the evidence could bear an implication that husband refused to pursue available employment opportunities, wife failed to adduce any evidence pertaining to husband's present earning capacity if he were to diversify his practice in an attempt to increase his workload and income.

To be sure, here, as in *Hendgen*, there was a substantial prospect that husband's income would improve as the professional economy improved. Nevertheless, as in *Hendgen*, "it would be pure speculation to place a dollar figure on what that additional income might be. Even assuming [the] husband's greater earning capacity, support cannot be determined in the absence of evidence of what that earning capacity might be." 242 Or App at 250.

Because the trial court erred in its finding regarding husband's earning capacity, its derivative determinations of the amount of transitional and compensatory spousal support were necessarily flawed.

The same error requires a remand of the child support award. "When determining a parent's gross income for child support purposes, a trial court must inquire into the parent's present income." *Leif and Leif*, 246 Or App 511, 519, 266 P3d 165 (2011). "Under Oregon law, the amount of child support a parent must pay is determined by a procedure established by the Department of Justice pursuant to ORS 25.275. That procedure is set forth in the Oregon Child Support Guidelines, [*see* OAR 137-050-0700 - 137-050-0765.] Under those guidelines, a court uses a formula to determine each parent's presumptive child support obligation. The gross incomes of the parents are factors in the formula." *Id.* at 514 (footnotes and citations omitted). The guidelines also contemplate the use of potential income to calculate a parent's child support obligation under appropriate circumstances. *See* OAR 137-050-0715(5) - (8). However, under the circumstances in this case, as with spousal support, for the court to calculate child support using potential income of $8,000,

evidence of husband's potential income had to be nonspeculative and relate to his present earning capacity. Like the spousal support awards, the trial court here calculated the child support award based on the court's unsupported finding that husband's present monthly earning capacity was $8,000. Accordingly, we also reverse the child support award.

Awards of child support and spousal support reversed and remanded; otherwise affirmed.