GARRETT, J.
*359 In this appeal of a judgment dissolving his marriage to wife, husband challenges, among other things, the trial court's property division. At the center of his appeal is the court's treatment of a family-owned restaurant business, Expressway Restaurant Holdings, Inc. (Expressway), which supported the parties' lifestyle during the marriage. According to husband, his stock in Expressway, although acquired during the marriage, was gifted to him alone by his parents and should not have been divided equally. We are not persuaded that the trial court erred by dividing the property as it did on this record, and we therefore affirm the dissolution judgment.[1]
Before describing the background of this case, we note that husband does not seek de novo review, ORS 19.415(3), nor is such a review warranted. See ORAP 5.40 (8)(c) (explaining that this court will exercise de novo review only in exceptional cases). Consequently, we are "bound by the trial court's express and implicit factual findings if they are supported by any evidence in the record." Morton and Morton , 252 Or. App. 525, 527, 287 P.3d 1227 (2012). As we will later discuss, the trial court expressly found husband not credible, and the court rejected husband's parents' version of events when it ruled in wife's favor-an implicit determination that their description of events was not credible-at least with regard to their donative intent. We state the following facts in accordance with those express and implicit credibility determinations.[2]
Husband and wife began living together in 2004, and they had a son in early 2006. They subsequently married in August 2006, when their son was six months old.
*360 At the time they married, husband worked as an employee of Expressway, a corporation then-owned in equal shares by his parents, Alex Schwindt and Deborah Schwindt (the Schwindts). Expressway was the parent company for the Schwindts' McDonald's franchise restaurant holdings. The Schwindts acquired their first McDonald's restaurant in 1991, located in Milwaukie; acquired a second in Oak Grove in 1994; and then acquired a third in Clackamette Park in 2000. Generally speaking, Alex Schwindt operated the franchises, and Deborah Schwindt handled the accounting and bookkeeping.
Husband had worked periodically at his parents' McDonald's franchises as a teenager in the early 1990s, and returned in 2002 as a manager trainee and entered the McDonald's "Next Generation" program, a program that prepares children of owner-operators to take over family-run McDonald's franchises. Husband worked as a "swing manager," salaried *861 manager, general manager, and then supervisor. However, to be an "approved operator" under the Next Generation program, a candidate must hold "a majority of shares in the parents' organization," and "in order to begin the process, you'd need to have a 20 percent minimum ownership." Thus, for husband to take over as an operator of his parents' business, it was necessary for him to become a shareholder.
From the very beginning of husband and wife's marriage, they had discussions with Alex Schwindt about "buying the business." The family was "constantly trying to figure out how we were going to do this and how much money had to be paid and how it was going to take place and how could we avoid as many taxes as possible." It was a "constant conversation" in the family.
In 2006, the Schwindts consulted an accountant, Chuck Hallett of the firm Strader Hallett, to consider how to convey ownership of the family business to husband. The Schwindts had considered the possibility of husband purchasing Expressway stock, but they knew that husband did not have sufficient cash reserves to make a purchase. Additionally, Hallett urged them to transfer the stock to husband by gift for tax reasons, among others. Thus, the *361 Schwindts, with the help of Strader Hallett, "explored sales, [ ] explored gifting, [and] explored combinations of both. And at the end of the day, the gift scenario appeared to be the best match."
On December 31, 2006, and January 1, 2007, the Schwindts began that gifting process by transferring shares of Expressway to husband, in his name alone, such that he became a 49.9 percent shareholder of the company, with the Schwindts retaining 50.1 percent. Strader Hallett prepared gift tax returns for the Schwindts reflecting those transfers.
In the years that followed, Expressway was the primary source of husband and wife's family income. Husband's salary from the business rose steadily from around $57,000 in 2007 to approximately $93,000 in 2013. In addition, the parties used business accounts to pay for personal expenses throughout the marriage, including such things as their son's Montessori school tuition. Another accountant from Strader Hallet, Richard Hall, estimated the personal expenses paid through the business to be approximately $2,000 per month. Husband took significant draws from the company-more than $500,000 between 2008 and 2014.
Wife, too, became involved in the family business. Before their marriage, wife had been employed as a receptionist and real estate assistant for a real estate company, with the prospect of becoming a real estate broker. After their son was born, wife instead learned bookkeeping skills and began working for Expressway, handling some of the same duties that had been performed by Deborah Schwindt. With that arrangement-wife staying home with their son and handling office responsibilities such as payroll and profit-sharing-husband was able to travel, attend meetings, and otherwise run operations for the restaurants.
Wife's initial salary was around $10,000 in 2007, and rose to approximately $40,000 by 2012, as she took over more duties. Wife's salary was kept lower for tax reasons, with the understanding that husband's and wife's income were all "going to the same place."[3]
*362 Meanwhile, Alex Schwindt continued to receive a salary from Expressway, continued to run personal expenses through the business, and continued to take significant draws from the business. Payments from the business to Alex Schwindt were documented in ways that were designed to minimize tax consequences. For instance, on one occasion, husband's father received a $50,000 "loan" from Expressway, which he was not expected to pay back.
In 2010, Alex and Deborah Schwindt divorced. As part of their divorce, Deborah transferred all of her shares to Alex, which resulted in Alex owning the majority share of the company. In exchange, Deborah Schwindt received a 10-year employment contract with Expressway, requiring the *862 company to pay her $75,000 per year, notwithstanding the fact that she did not have an active role in the company after the divorce and had transferred all of her accounting duties to wife.
By 2012, Alex Schwindt had moved to the Oregon Coast, and husband and wife were essentially running the business. As they had throughout the years after the initial share transfers, the family continued to have discussions about how much to pay Alex Schwindt to "retire" him from the business. Wife, in particular, was frustrated with the fact that Alex Schwindt "kept wanting more and more money. And he didn't seem to understand that the business wasn't responsible for his debt and what he was paying to [Deborah Schwindt]."
By the summer of 2012, husband and his father appeared to be close to finalizing the terms of transferring the business to husband. Expressway sold one of its restaurants-Clackamette Park-for a little more than $1 million. According to husband, after liquidating liabilities of that restaurant, the remaining proceeds of the sale were approximately $800,000. On June 5, 2012, husband sent his father an email outlining a proposal:
"Here is what I propose.
"As you asked for I would like to write you a check for $400,000.00 along with the other things we discussed to get to the total you said was the total you would be happy with to retire and enjoy the next chapter of your life. Upon *363 acceptance I will receive the balance of the stock shares (less 1% due in December 2012). After this the company will no longer be paying any of your executive expenses including and not limited to
"BMW payment[;] Any auto insurance[;] Company credit card (you have a balance of $12,900.00 from home building expenses we have been paying interest only on as you requested)[;] Dish network[;] Health insurance[;] Century link internet [;] Cell phone[;] Or any incidental occurring costs."
(Spacing altered.)
On June 19, 2012, husband sent Hall a letter stating, "Here is where we are. We have executed the gift letter. (Alex has been funded) Prior to this, Alex received a check for $400K[.] At this same time I received a check for [$]180K. I still have some distribution to go to be even. (Keep [in] mind out of the Clackamette park $ I spent $120k to pay off some debt. I can recode this to whatever to move forward.)."
According to husband, as part of the terms of the buyout, his father ultimately received $520,000 "in cash and in gift" from husband after the sale of the Clackamette property-essentially all of the proceeds of the sale after the tax liability of $280,000. Alex Schwindt's name was removed from business bank accounts, he stopped receiving a salary from the company, and he transferred a small number of shares to husband that reversed their share positions, making husband the primary operator of the franchises under the franchise agreements: Husband now owned the majority interest, 50.1 percent of the shares, while Alex Schwindt owned 49.9 percent.
Husband testified that the transfer of the additional shares, making him the primary operator, was a continuation of the plan that they had long discussed. Husband testified about the importance of considering a succession plan and was asked, "So that's what you indeed did, and then your family executed the plan that they had discussed?" He answered, "Absolutely. We-we discussed many plans between me and my dad. We'd sit and have a beer and talk about it. But we did execute the plan in the end that made the most sense." Then he had this exchange with counsel:
*364 "Q. Starting with the gifting back in 2006, 2007-
"A. Correct.
"Q. -culminating with you having the 51 percent shares now?
"A. Correct."
Shortly thereafter, in April 2013, wife commenced an action to dissolve the parties' marriage. Hall, who had advised husband and his father regarding the gifting process in 2012, prepared a valuation of husband's 50.1 percent interest in the company. He valued that interest, as of December 31, 2013, at $910,317.
*863 At the dissolution hearing, husband asserted that, under ORS 107.105(1)(f)(D), wife had no interest in Expressway, which had been gifted to him-albeit after the marriage. That statute provides that "[p]roperty acquired by gift to one party during the marriage and separately held by that party on a continuing basis from the time of receipt is not subject to a presumption of equal contribution." ORS 107.105(1)(f)(D)(i). "[P]roperty acquired by gift" is defined as "property acquired by one party through gift, devise, bequest, operation of law, beneficiary designation or inheritance." ORS 107.105(1)(f)(D)(ii).
Wife disagreed with husband's characterization, arguing that the business was in fact purchased from husband's father, not gifted, and that it was simply structured as a gift for tax reasons. She further argued that, although husband and his father had agreed on a complete buyout, they had stopped short of transferring all of the remaining shares of Expressway to husband after husband and wife were having marital problems, in an effort to shield those assets from potential dissolution proceedings.
In its dissolution judgment, the trial court agreed with wife's contention that husband's interest in Expressway had not been a "gift" within the meaning of ORS 107.105 (1)(f)(D). With regard to the business, the trial court explained:
"Expressway Restaurant Holdings, Inc. ('the business') was valued by Husband's expert, Philip Hall of Strader Hallett & Co. Mr. Hall's methodology made sense and he *365 valued Husband's 50.1% ownership interest at $900,000. Husband, Wife, and Husband's family discussed different methods of passing the entire interest in the business from Husband's parents to Husband, but the entire transfer has not yet happened. This may have been for tax purposes or because the divorce was contemplated, but regardless the full transfer was not completed. However, Husband's father, Alex Schwindt, received payment for some portion of the business, although not the entire amount. Further, the value of the business is subject to the employment contract between the business and Husband's mother, Deborah Schwindt. Therefore, Husband's ownership interest is set at 50.1% and the court accepts Mr. Hall's value for this portion of the business.
"* * * * *
"The transfer of the business to Husband was not a gift as defined by ORS 107.105(1)(f)(D). Although husband's parents may have transferred it in this way for tax purposes, the evidence does not support that the transfer was truly a gift. The behavior of Husband and his family did not demonstrate what the parties may have intended by their earlier actions. Husband's testimony to the contrary was not credible.
"The business is a marital asset. It was acquired during the marriage.
"Husband did not rebut the presumption of equal contribution. The evidence reflected that the parties used the business account as their personal account, paying for personal expenses throughout their marriage. Wife relied on the business as a joint asset. The business was treated as a joint asset by the parties until the divorce loomed."
(Paragraph lettering omitted.)
After concluding that husband's interest in Expressway had not been "gifted" to him, the court provided an independent and alternative basis for dividing it equally: the business had been integrated into the parties' common finances through commingling. See ORS 107.105 (1)(D)(f) (concerning division of property "as may be just and proper in all the circumstances"); Kunze and Kunze , 337 Or. 122, 142, 92 P.3d 100 (2004) (describing the considerations bearing on "whether equity requires the court to include a separately acquired asset in the property division *366 under ORS 107.105(1)(f) because of the integration of that asset into the shared finances of the marital partnership through commingling"). With regard to commingling, the court explained:
"Even if the court believed that the business transfer was a gift alone, which is not supported by the evidence, the law requires the court to divide all property equitably based upon a just and proper analysis.
*864 The parties clearly commingled their business and personal assets. In addition, Wife's reduced income while working for the business is a marital contribution to the growth of the business and Husband's interest in the business, because her income was kept small for tax purposes. It would be inequitable to treat the business as separate property and the court declines to do so."
Based on those determinations, the court declared husband to be the sole owner of his shares of Expressway, free and clear of any claim by wife; and, after dividing the remaining assets and considering other expenses, the court required husband to pay an equalizing judgment in the amount of $399,776.
On appeal, husband argues that the trial court erred in the property division because it ignored the "uncontradicted evidence that Expressway Holdings was a gift solely intended for husband," and that the "trial court's declaration that 'I don't believe it was really a gift' is contrary to all of the evidence." According to husband, "[a]ll of the witnesses agreed it was a gift solely to husband and the record establishes that gift tax returns were filed with the IRS to document the transaction."
As the proponent of the argument that his interest in Expressway was a "gift" under ORS 107.105(1)(f)(D), husband had the burden of persuasion as to that issue. See OEC 305 ("A party has the burden of persuasion as to each fact the existence or nonexistence of which the law declares essential to the claim for relief or defense the party is asserting."). Thus, it was husband's burden to persuade the court regarding the Schwindts' donative intent with regard to Expressway. And, contrary to husband's argument before us, the evidence on that point did not compel the court to accept his version of the facts. See generally Bezoff v. Crater Lake Motors, Inc., 259 Or. 449, 451-52, 486 P.2d 1274 (1971)
*367 (explaining that "there is no rule of law which requires the court to accept at face value [a] plaintiff's testimony" and that even "uncontradicted" testimony can be disbelieved in light of factors such as "the availability of evidence to contradict the witness's statement" and "the likelihood that the witness's interest in the litigation may tempt him to testify falsely" (internal quotation marks omitted) ).
Here, husband and his parents had an interest in protecting husband's assets during the dissolution. Beyond that, there was circumstantial evidence that the Schwindts-and, in particular, Alex Schwindt-transferred the shares for the purpose of transitioning operations of the franchise to husband but with the expectation that he eventually would be compensated for those shares. There was evidence that husband and his family had contemplated a sale, but that husband lacked the assets to accomplish that type of transfer. Husband himself testified that the "gifting" succession plan, which was used as an alternative to a sale, had started in 2006 or 2007 and "culminated" in his ownership of 51 percent of the company in 2012. Yet, there also was evidence that the culmination of the plan-the 2012 "gift" of additional shares-was not a gift at all, but was a transfer in exchange for a payout worth far more than the small number of shares that were transferred at that time and the expenses being saved by "retiring" Alex Schwindt from the business.[4]
*865 *368 From that testimony, along with wife's testimony about "constant" discussions in the family from the beginning of the marriage about how much Alex Schwindt would be paid to retire, as well as "loans" from the business to husband's father that he was not expected to pay back, the trial court reasonably could have been unpersuaded that the gift tax returns and the Schwindts' and husband's testimony reflected the parties' true donative intent. Again, husband bore the burden of persuasion on that issue, and his evidence did not compel a finding by the trial court that his interest in Expressway was acquired by gift.[5]
In any event, even assuming that husband were correct that the business was a "gift," his appeal faces another hurdle: the trial court's alternative analysis concerning commingling. As described above, the court concluded that the "parties clearly commingled their business *369 and personal assets," that wife's reduced income contributed to the marital growth of the business, and that "it would be inequitable to treat the business as separate property and the court declines to do so." We conclude that the trial court's "just and proper" determination in that regard was well within its discretion on this record, and it provides an independent ground upon which to affirm the property division. See Code and Code , 280 Or. App. 266, 274, 380 P.3d 1073 (2016) (explaining that, "unless the trial court committed legal error in the process of determining the overall property division, the court's ultimate determination as to what overall property division was just and proper in all the circumstances was committed to its discretion." (Internal citation and quotation marks omitted.) ).
Even when property has been gifted to one spouse, a trial court nonetheless retains the discretion to divide that asset equally based on a consideration of what is just and proper under all the circumstances. In determining the equity of the property division in view of all the circumstances of the parties, the court can consider
"the social and financial objectives of the dissolution, as well as * * * the preservation of assets; the achievement of economic self-sufficiency for both spouses; the particular needs of the parties and their children; and * * * the extent to which a party has integrated a separately acquired asset into the common financial affairs of the marital partnership through commingling ."
*866 Kunze , 337 Or. at 135-36, 92 P.3d 100 (emphasis added).
In this case, the evidence was more than sufficient to support the court's determination that the parties had completely integrated husband's interest in Expressway into their common financial affairs. The parties treated the business as their sole source of family revenue, using the business to pay for every manner of personal expense from the beginning of the marriage; wife left her job and worked at the business during critical wage-earning years, passing up the opportunity to pursue a real estate career, in a role that allowed her to be home with their son and allowed husband to run the operations side of the business; and she took a reduced income for tax purposes to benefit the business, *370 which reduced her earnings for future Social Security payments. In light of those facts, the trial court did not err in concluding that the parties commingled Expressway with their common financial affairs.
Nor can we say that the court erred in dividing the property evenly based on the degree of commingling and other equitable considerations. There was evidence that the family structured its life in many ways around Expressway, including wife's employment, their childcare, and their payment of expenses during wife's critical wage-earning years. On the whole, this simply is a case like Morgan and Morgan , 269 Or. App. 156, 165, 344 P.3d 81, rev. den. , 357 Or. 595, 358 P.3d 1001 (2015), in which "reasonable minds will differ concerning the equitable priorities herein, and we are unwilling to say that the court's property division was an abuse of its discretion." (Internal quotation marks omitted.)[6]
Affirmed.

We reject without written discussion husband's arguments concerning other aspects of the judgment.

The dissent's version of the facts relies on explanations supplied at trial by husband and his parents. That approach is flatly inconsistent with the deference afforded to the trial court's findings. The trial court was entitled to, and apparently did, disbelieve their explanations of their donative intent, perhaps in light of their demeanor, because of their interests in protecting husband's assets, or because it simply found the explanation to be at odds with other evidence. In any event, our standard of review in this case does not involve second-guessing the court's credibility determinations.

In its oral findings, the court noted that she was underpaid at Expressway for a while, though not "significantly."

The dissent relies heavily on the trial court's finding that husband's father "received payment for some portion of the business, although not the entire amount." 290 Or. App. at 381, 414 P.3d at 872 (Devore, J., dissenting). The dissent understands that finding to mean, by implication, that the shares conveyed in 2006/2007 were the "portion" of the business for which husband's father was not paid. We understand the finding very differently. The immediately preceding sentences of the judgment state:
"Expressway Restaurant Holdings, Inc. ('the business') was valued by Husband's expert, Phillip Hall of Strader Hallett & Co. Mr. Hall's methodology made sense and he valued Husband's 50.1% ownership interest at $900,000. Husband, Wife, and Husband's family discussed different methods of passing the entire interest in the business from Husband's parents to Husband, but the entire transfer has not yet happened. This may have been for tax purposes or because the divorce was contemplated, but regardless the full transfer was not completed. However, Husband's father, Alex Schwindt, received payment for some portion of the business, although not the entire amount ."
(Emphases added.)
Thus, the reference to husband's father receiving "payment for some portion of the business, although not the entire amount" appears in the context of a broader description of the fact that the "full transfer" of the "entire interest" in the business-that is, the entire interest in Expressway Restaurant Holdings, Inc.-had not been completed. In that context, the reference to partial payment is more plausibly understood as a finding that husband's father has not been paid the entire amount for a full transfer of the entire interest in the business , and not as an implicit finding about payment for the 2006/2007 share transfers specifically.

In concluding otherwise, the dissent credits testimony that was expressly or implicitly rejected by the trial court, which as noted, 290 Or. App. at 375 n.2, 414 P.3d at 868 n.2 (DeVore, J., dissenting), is inconsistent with our standard of review. It also embarks on an analysis that distinguishes between share transfers in 2006/2007 and later in 2012, which is not a distinction that husband has ever purported to draw and that would undoubtedly come as a surprise to the trial court and the parties. That is, the dissent faults the trial court for "treat[ing] alike two sets of transfers, occurring five years apart under potentially different circumstances," 290 Or. App. at 382, 414 P.3d at 872 (DeVore, J., dissenting), but that was exactly how husband treated them and continues to treat them. Husband understood his interest to have been gifted in its entirety through the succession plan, culminating in 2012, and he has litigated the case that way throughout.
Relatedly, and contrary to the dissent's criticism, our analysis in that regard is not driven by a sense that we are "bound to a simplistic choice between either party's self-serving, single conclusion," or because we "assume[ ] that the characterization of the stock transfers at two different times allows only one answer because husband argued both sets of transfers were gifts while wife argued both were purchases." 290 Or. App. at 384 n.10, 414 P.3d at 873 n.10 (DeVore, J., dissenting). Rather, we are constrained by our role as a reviewing court, in which our task is to consider whether the trial court's ruling was a legally permissible answer, not whether there was "only one answer." And, in performing that task, we are "bound" not by the party's conclusions or characterizations but by the trial court's implicit and explicit factual findings.

The dissent would hold that the court erred by treating commingling as an all-or-nothing proposition, citing Kunze and Morgan . 290 Or. App. at 398, 414 P.3d at 881 (DeVore, J., dissenting). There is no indication that the trial court felt constrained to take an "all-or-nothing" approach, and nothing in Kunze or Morgan precludes a court from dividing commingled property equally. That is, nothing in those cases suggests that property will never be sufficiently commingled, particularly in light of other equitable factors, to justify dividing it equally. Under the circumstances here, the equal division of property was within the permissible range of the trial court's discretion.