GARRETT, J.
*212 Respondent Fisher appeals a general judgment of dissolution of a nonmarital domestic relationship and a supplemental judgment awarding attorney fees to petitioner. Respondent asserts three assignments of error. In the first assignment, he argues that the trial court erred when it ruled that petitioner Staveland was entitled to half of the appreciation in value of respondent's house (the Dickinson house) that occurred while she lived there with respondent. In a second assignment, respondent challenges the trial court's calculation of appreciation, arguing that the court erred by awarding petitioner appreciation that accrued after the parties separated. In a third assignment, respondent asserts that the trial court erred in awarding *751 petitioner attorney fees without adequately explaining the basis of its award. For the reasons below, we reverse and remand the general judgment for recalculation of the division of property, vacate and remand the supplemental judgment, and otherwise affirm.
Neither party seeks de novo review, ORS 19.415(3), nor do we conclude that it is warranted. See ORAP 5.40 (8)(c) (explaining that this court will exercise de novo review only in exceptional cases). Consequently, we are " 'bound by the trial court's express and implicit factual findings if they are supported by any evidence in the record.' " Schwindt and Schwindt , 290 Or. App. 357, 359, 414 P.3d 859, rev. den. , 363 Or. 119, 421 P.3d 353 (2018) (quoting Morton and Morton , 252 Or. App. 525, 527, 287 P.3d 1227 (2012) ).
The parties met in April 2011. In June of that year, respondent purchased the Dickinson house for $467,500. Petitioner did not contribute to the purchase, and title was taken in respondent's name only. The parties moved in together at the Dickinson house later that month.
When the parties moved in together, they talked about sharing living expenses. Respondent agreed to pay the mortgage, property taxes, homeowners' insurance, and some food expenses; petitioner agreed to pay for "everything else," including utilities, car insurance, and other food expenses. Overall, respondent paid more expenses than petitioner. Each party also worked to improve the house, including *213 painting rooms, tiling and carpeting floors, and removing a wall between rooms. Overall, respondent did the majority of the work on most projects, and some projects were completed by respondent alone. All materials for the improvements were paid for by respondent. With respondent's approval, petitioner made most of the decisions regarding the selection of furniture, color schemes, the arrangement of art, and other decorations.
Meanwhile, the parties kept their respective incomes and financial accounts separate. The one exception was a joint Vanguard investment account. The parties carefully tracked their respective contributions to, and interest in, that account.
Petitioner also owned a house on Ainsworth Street (the Ainsworth house), which she operated as a rental property during her period of cohabitation with respondent. Respondent held no interest in that property at any time. When the parties began cohabitating, the Ainsworth house was "underwater" (i.e. , had a market value less than the outstanding mortgage). At all times, petitioner solely assumed the liabilities and responsibilities associated with the Ainsworth house, including mortgage payments, taxes, and the collection of rental income, which petitioner kept separate. Respondent contributed no money and minimal labor toward that property; on three occasions, respondent fixed a toilet, installed a stove, and helped tenants move out.[1]
In December 2011, respondent proposed marriage. Petitioner believed that marriage would have negative tax consequences. Thus, instead of getting legally married, the parties held a ceremony at the Dickinson house that resembled a wedding but was not accompanied by legal action to change the parties' marital status. The parties distributed invitations that referred to the Dickinson house as "our house," and approximately 40 to 50 friends and family members attended, only some of whom understood that respondent and petitioner were not getting legally married.
*214 Petitioner's father conducted the ceremony, and the parties exchanged rings and vows and hired a professional photographer and band. After the ceremony, the parties told at least some friends and acquaintances that they were "married."
In March 2014, the parties' son was born. Petitioner assumed a majority of the childcare duties, although respondent also provided some daily childcare. Petitioner paid for direct childcare expenses like clothes, diapers, food, and medical care. Respondent *752 contributed to those costs indirectly by sometimes writing checks to petitioner.
In the fall of 2015, petitioner began to discuss separating from respondent. Respondent told petitioner that, if she was not going to be his partner anymore, she should start paying him rent. Petitioner suggested that she pay $1,000 per month. The parties never acted on that conversation, however, and petitioner moved out of the Dickinson house in December 2015.
Upon separating, the parties agreed to divide their separately owned financial accounts according to whose name was on the account. Respondent agreed that petitioner would keep all of her interest in the Ainsworth home, which had appreciated substantially during the parties' relationship and was no longer "underwater." The parties agreed to divide the Vanguard account based on their respective contributions. The parties never discussed or reached any express understanding regarding their respective interests in the Dickinson house.
Petitioner brought this action for dissolution of the nonmarital domestic relationship, seeking custody of the parties' son, and asserting an interest in one-half of the appreciation in value of the Dickinson house. At trial, the parties testified to their different views regarding the Dickinson house. Respondent testified that he never intended to share his assets with petitioner; petitioner, in contrast, said that she had viewed the Dickinson house as "our house" during the time that she lived there.
An appraiser hired by petitioner concluded that the Dickinson house was worth $635,000 as of October 19, 2016 (near the date of trial). The appraiser also testified that the *215 Dickinson house had appreciated 10.3 percent in the preceding year and estimated that, when petitioner moved out in December 2015, the Dickinson house might have been worth between $584,000 and $585,000. The appraiser then qualified that estimate, explaining that, although the estimated range as of December 2015 was "an indication" of what the house could be worth, that figure was less reliable than a true appraisal.
After the close of evidence, the trial court made the following findings regarding the Dickinson house:
"* * * [E]verybody agrees that legally the analysis is under [ Beal v. Beal , 282 Or. 115, 577 P.2d 507 (1978) ] and what their intent was. And frankly, your intent [was] to be married. Your intent was to have a family and live together for the rest of your lives. You were very much in love and you wanted to get married, and * * * I know that you got advice from a tax person that it would cost you some money if you got married, and I'm not gonna go behind your decision.
"But it was clearly both of your decisions that because of the tax consequences that you understood would occur if you married, and you both decided that what you would do is get married but for the paperwork, but for the license and registering the marriage.
"You, frankly, held yourselves out as husband and wife. You bought rings. You exchanged vows. You * * * told people at work and probably people who are parents of-friends or playmates of [your son's] that you were married, and the only people you * * * told the truth to were your very closest family and friends.
"And so there isn't any question in my mind that your intention was to live as a married couple, to raise the child as a married couple in spite of the fact that you were not legally married. * * *
"* * * [T]here is no question [that respondent] chose the house, you paid * * * the down payment, you paid the mortgage, the deed's in your name. And there also isn't any question that as you[2] were testifying the first day * * * you referred to it as: We moved into our house; we fixed *216 up our house; we painted our house; we had our wedding ceremony-or our non-wedding ceremony at our house. You invited people to come to our house.
"* * * I think probably until both of you met with lawyers to talk about what the * * * law is in this situation that you stake out your positions until you figured out *753 what it needed to be in order to keep the home as for yourself, because there isn't any question that * * * that was your family home, and your plan was to raise your child there.
"And there isn't any question that you fixed it up together, that you each contributed to fixing up that home. And I'm sure that [respondent] paid a great deal more in terms of financial contribution. I'm sure that [petitioner] and other members of her family contributed significant physical labor and decision making about decor and colors and all of those things.
"You've lived in that house, it's your family home, and you both cared for it and fixed it up and treated it as your family home. So * * * she is entitled to one-half of the increase in the value of the home.
"But the only truly solid number that I have for current value is the 635- number. [The appraiser], in response to a question was, well, how did you come up with this 10.3 percent over the years, over the more than 1 percent a month, and he did the math, came up with another number.
"And then you went on to testify that that's not really a valid way to appraise a house and come up with a value. There has to be an appraisal done at the * * * point in time where you're asking for what that value is."
The court entered a judgment awarding petitioner 50 percent of the appreciated value of the Dickinson house that had accrued since the parties began cohabitating in June 2011. The court calculated the appreciation in value by subtracting the 2011 purchase price of $467,500 from the October 19, 2016, appraised value of $635,000, resulting in $167,500. The court then awarded petitioner one-half of that amount, offset by a separate $5,000 debt that petitioner owed respondent, for a total award of $78,500.[3] Respondent appealed.
*217 In two assignments of error, respondent challenges the trial court's award of half the appreciated value of the Dickinson property to petitioner. First, respondent argues that an equal division under the circumstances is neither just nor equitable. Second, respondent argues that, even if the trial court did not err in making an equal division, the court erred in calculating it because it based its calculation on the October 2016 appraised value of the property, not the value at the time that petitioner moved out. We address the arguments in turn.
Because the parties were never legally married and because Oregon does not recognize common-law marriage, the parties are not subject to the statutes governing the distribution of marital property, including the presumption of equal contribution to property acquired during the marriage. ORS 107.105. Nevertheless, a court may distribute property owned by the parties in a nonmarital domestic relationship according to the framework set out in the Supreme Court's decision in Beal :
"[A] division of property accumulated during a period of cohabitation must be begun by inquiring into the intent of the parties, and if an intent can be found, it should control that property distribution. * * * [A]bsent an express agreement, courts should closely examine the facts in evidence to determine what the parties implicitly agreed upon.
"More often than not, such an inquiry will produce convincing evidence of an intended division of property, but we recognize that occasionally the record will leave doubt as to the intent of the parties. In such cases, inferences can be drawn from factual settings in which the parties lived. Cohabitation itself can be relevant evidence of an agreement to share incomes during continued cohabitation. Additionally, joint acts of a financial nature can give rise to an inference that the parties intended to share equally. Such acts might include a joint checking account, a joint savings account, or joint purchases."
282 Or. at 122, 577 P.2d 507 (citations omitted). Those "factual settings" are not exclusive: Also relevant to the parties' implicit *754 intent are, among other things, whether the parties held themselves out to the community as married, how title to the property was held, and the parties' respective financial and *218 nonfinancial contributions to their assets. See Wallender v. Wallender , 126 Or. App. 614, 617, 870 P.2d 232, rev. den. , 319 Or. 150, 877 P.2d 86 (1994). No one factor is dispositive. Pinto and Smalz , 153 Or. App. 1, 6, 955 P.2d 770 (1998) (citing cases holding that various particular factors are not dispositive in determining equitable division of property in nonmarital domestic relationship). The court may exercise its equitable powers to "reach a result that is fair under all of the circumstances." Id. ; see also Wilbur v. DeLapp , 119 Or. App. 348, 351, 850 P.2d 1151 (1993) ; Shuraleff v. Donnelly , 108 Or. App. 707, 712, 817 P.2d 764 (1991).
The Beal line of cases was decided before the legislature amended ORS 19.415, which made de novo appellate review discretionary in equitable cases. We have not previously addressed, in cases where we have declined to exercise de novo review, how we should review the trial court's exercise of its equitable powers regarding the division of property in the dissolution of a nonmarital domestic relationship. The parties do not address that question. Because a trial court's exercise of its equitable powers in this context is analogous to its exercise of discretion in marital dissolution cases, we conclude that we should apply the same standard of review: abuse of discretion. Cf. Kunze and Kunze , 337 Or. 122, 135-36, 92 P.3d 100 (2004) (court's final inquiry in marriage dissolution as to the "just and proper" division of property "concerns the equity of the property division in view of all the circumstances of the parties" and is "a matter of discretion").[4]
The evidence in this case allowed the trial court reasonably to infer that the parties implicitly agreed to share equally in the appreciated value of the Dickinson house that accrued during the parties' cohabitation. First, the fact that the parties were never "legally" married-a fact on which respondent relies heavily-is of little significance. The record permitted the inference that the parties saw themselves as married, in light of the fact of the "wedding" ceremony at the Dickinson house and the way in which *219 the parties held themselves out to others. See Holloway v. Holloway , 63 Or. App. 343, 347, 663 P.2d 798, rev. den. , 295 Or. 617, 670 P.2d 1033 (1983) (inference that the parties intended to share property equally was supported by evidence that the parties held themselves out to others as husband and wife, including exchanging rings); cf. Brazell v. Meyer , 42 Or. App. 179, 184, 600 P.2d 460 (1979) ("Her use of his last name in taking title must be taken as a manifestation of an intent with respect to that property that they be treated as if married, even though they knew that they were not."). When the parties' son was born, both parties provided childcare and paid the costs associated with raising their son in the Dickinson house, and petitioner assumed the role of primary caregiver. See McWhirter v. McWhirter , 54 Or. App. 409, 412-13, 635 P.2d 12, rev. dismissed , 292 Or. 334, 644 P.2d 1127 (1981) (petitioner's contribution to the maintenance of the household, including taking care of respondent's two children along with her own daughter, supported inference that the parties intended that their property was owned jointly).[5]
Moreover, although the parties kept other assets separate (except the Vanguard account), the record supports a determination that they treated the Dickinson house as a joint asset, cohabitating there for over four *755 years and contributing both money and labor to living expenses and improvements. See Wallender , 126 Or. App. at 617, 870 P.2d 232 (intentions of parties may be different as to discrete assets); Wilbur , 119 Or. App. at 352, 850 P.2d 1151 (plaintiff's contributions of funds, labor, and homemaking duties warranted awarding the plaintiff one-half of the interest in the house, notwithstanding that only defendant's name was on the title and only defendant made mortgage payments); Raimer and Wheeler , 119 Or. App. 118, 120-21, 849 P.2d 1122 (1993) (parties' individual contributions of both funds and labor to a ranch supported inference *220 that the parties intended to share equally in profits from the asset, notwithstanding that only one party held title in the asset). The parties also described the Dickinson house as "our house" to friends and family. See Ewing and Harrison , 206 Or. App. 478, 482, 136 P.3d 1157 (2006) (parties' statements about ownership of assets relevant to intent); Rissberger v. Gorton , 41 Or. App. 65, 72, 597 P.2d 366, rev. den. , 287 Or. 301 (1979) (same).
The trial court could reasonably infer from all of those facts that the parties intended to share equally in appreciation in the Dickinson house that accrued during the cohabitation. See Pinto , 153 Or. App. at 6-7, 955 P.2d 770 (petitioner's intent to live as husband and wife, to which respondent did not object, supported 50-50 division of property held in respondent's name only); Holloway , 63 Or. App. at 347, 663 P.2d 798 (same); Brazell , 42 Or. App. at 184, 600 P.2d 460 (same); cf. Branam and Beaver , 225 Or. App. 630, 639-40, 202 P.3d 886 (2009) ("[T]he evidence of intent in * * * Brazell that led us to conclude that the parties intended to share property equally, and to disregard the parties' unequal contributions to the initial acquisition of the property, was the fact that the parties held themselves out as [a] married couple[ ] . That fact was evidence that the parties, although unmarried, intended to take title as though they were married , which, in turn, invoked the presumption of a gift that arises when a husband and wife take title jointly." (Emphases in original.) ).
Respondent argues that it is neither just nor equitable for petitioner to be awarded appreciation in the Dickinson house unless respondent also receives a share of the appreciated value of the Ainsworth house that accrued during the cohabitation. However, we cannot conclude that the trial court acted outside of its discretion by awarding petitioner interest in the Dickinson house and not awarding respondent interest in the Ainsworth house. There is no evidence that the parties ever intended to share the Ainsworth house. Respondent assumed no responsibilities with the house, and petitioner continued to assume all risks and liabilities associated with the house and paid the necessary costs and expenses of ownership. Respondent never lived there, never made any financial contribution to the house *221 without expectation of repayment, and contributed only minimal labor toward the house by fixing a toilet, installing a stove, and helping tenants move. In short, we are not persuaded that the trial court was required to view the Ainsworth property any differently than the various other assets that the parties continued to hold separately during their cohabitation.
For the foregoing reasons, we conclude that the trial court did not err by awarding petitioner one-half of the appreciated value of the Dickinson house. However, that does not resolve the matter of how that value was calculated. As respondent points out, that calculation relied on the October 19, 2016, appraisal value, even though petitioner moved out in December 2015. Thus, argues respondent, the trial court's rationale for awarding petitioner one-half of the increased value during the period of cohabitation cannot justify 10 additional months' worth of appreciation.
We agree. In calculating petitioner's property award, the trial court cited the appraiser's testimony that the $584,000 to $585,000 estimate was less reliable than a formal appraisal, and accordingly reasoned that the $635,000 value as of October 19, 2016, was "the only truly solid number that I have for current value," adding that "[t]here has to be an appraisal done at the * * * point in time where you're asking for what that value is." (Emphasis added.) Similarly, the final judgment states that, "This money award is calculated using the Oct. 2016 appraised value *756 of the real property." Thus, it appears that the trial court determined the value of the Dickinson house as of October 2016 -rather than December 2015-and consequently awarded petitioner appreciation through October 2016 because it viewed the 2016 appraisal as the only reliable evidence of the Dickinson house's later value.
That was error. The evidence supporting the parties' intent to share interest in the Dickinson house comes entirely from parties' romantic relationship and cohabitation in the house, which undisputedly began in June 2011 and ended in December 2015. There is no evidence of intent to share the Dickinson house after December 2015. Accordingly, to the extent that the trial court's award reflects any increase in *222 value after petitioner moved out, the award is inconsistent with the court's determination of the parties' intent under the principles established by Beal . The trial court should have instead determined the house's value as of December 2015. We therefore remand for recalculation.
Finally, in his third assignment of error, respondent argues that the trial court erred in awarding petitioner attorney fees without adequately explaining the basis of its award. As we explain below, we agree.
After the trial court entered the general judgment of dissolution, petitioner requested attorney fees and costs under ORCP 68 and requested findings and conclusions of law of the court's basis for an award. According to petitioner's fee request, her counsel incurred approximately $47,445 in total fees on the case. Petitioner's counsel also stated that he had spent approximately two-thirds of his time on issues related to custody and parenting time; apparently on that basis, petitioner requested a fee award of $30,000. (The parties agree that the court lacked authority to allow the recovery of fees for time spent litigating property issues. Cf. ORS 107.105 (allowing for recovery of fees for litigating property issues only in cases of marital dissolution).) Respondent objected to the request, arguing, among other things, that the bulk of petitioner's counsel's time was spent on the property division issues.
The trial court issued a supplemental judgment awarding petitioner $20,000 in fees and costs. In the judgment, the trial court cited various factors set out in ORS 20.075, including the "time and labor required in the proceeding" and the "novelty and difficulty of the questions involved," but did not make any findings of fact or provide further explanation for the award. On appeal, respondent challenges the reasonableness of the fees and argues that the trial court failed to sufficiently explain the basis of the award to permit meaningful appellate review.
We agree with respondent that we are unable to meaningfully review the trial court's award in light of respondent's objections without further explanation by the trial court as to why it awarded the amount that it did. See, e.g. , *223 McCarthy v. Oregon Freeze Dry, Inc. , 327 Or. 84, 95, 957 P.2d 1200, modified on recons. , 327 Or. 84, 957 P.2d 1200 (1998) (vacating and remanding order of the Court of Appeals where the order "gave no explanation, through special findings of fact or otherwise, of the court's basis for the award"). The trial court's citation of several ORS 20.075 factors does not provide an explanation of how the trial court arrived at the amount of $20,000, as opposed to the $30,000 in fees that petitioner requested; it is unclear, for example, whether the trial court deemed respondent's objections partially meritorious or whether it had a different reason for its award. Under McCarthy , the trial court must "describe the relevant facts and legal criteria for [its] decision to award or deny attorney fees in any terms that are sufficiently clear to permit meaningful appellate review." Id. at 190-91, 957 P.2d 1200[6] ; *757 see also Frakes v. Nay , 254 Or. App. 236, 256, 295 P.3d 94 (2012), rev. den. , 353 Or. 747, 304 P.3d 38 (2013) (trial court's findings insufficient where the appellate court had "no way to know how the [trial] court went about reducing the hours" and "would be required to speculate as to how the trial court reached its $50,000 attorney fee award" even though more than $130,000 was requested); Schoch v. Leupold & Stevens , 325 Or. 112, 119, 934 P.2d 410 (1997) (Workers' Compensation Board's findings insufficient where board considered certain discretionary factors but made no factual findings explaining why it awarded smaller amount than requested). Accordingly, we vacate the supplemental judgment and remand for further proceedings.
General judgment reversed and remanded for recalculation of the division of property; supplemental judgment vacated and remanded; otherwise affirmed.

On one occasion, respondent also loaned petitioner $5,000 so that petitioner could pay property taxes on the Ainsworth house. As we note below, the trial court awarded respondent an offset of $5,000 of petitioner's property award representing repayment of that loan. That $5,000 offset is not challenged on appeal.

The record is unclear whether the trial court was referring to respondent or petitioner.

Based on the trial court's stated methodology, it appears that the award should have been $78,750, which is the result of subtracting $5,000 from half of $167,500 ($83,750). However, neither party raises that issue on appeal.

"This jurisprudential approach serves both as an invitation to principled arguments and a statement of self-restraint in favor of stability." Olson and Olson , 218 Or. App. 1, 14, 178 P.3d 272 (2008) (citing Gardner and Gardner , 212 Or. App. 148, 157, 157 P.3d 320 (2007) ).

To the extent that respondent argues that no person could reasonably infer that the parties saw themselves as married, given that they deliberately chose not to legally marry and chose to keep most of their assets separate, we disagree. Even if the facts in this case permit a competing inference that the parties did not see themselves as married, we cannot say the circumstances here precluded the trial court from inferring that the parties saw themselves as married, in light of all of the evidence. See Pinto , 153 Or. App. at 6, 955 P.2d 770 (no one factor is dispositive); Shuraleff , 108 Or. App. at 710-15, 817 P.2d 764 (equitable division granted despite parties' separate personal financial accounts and monthly division of living expenses).

The Supreme Court in McCarthy discussed a hypothetical analogous to the situation here:
"If a petition seeks payment for 60 hours of attorney time at $200 per hour, and the court believes that some lesser award is appropriate, the court could state in its order that, relying on the factors in ORS 20.075(2)(a) and (g), the court concludes that a reasonable number of hours is 50 and a reasonable hourly rate is $175 per hour. Ordinarily, the court would have no obligation, beyond providing that finding, to explain why the court does not accept the requested number of attorney hours or the requested hourly rate as reasonable, unless a more complete explanation is necessary in a particular case to permit meaningful appellate review."
327 Or. at 188 n. 1, 957 P.2d 1200.