SHORR, J.
*570 Petitioner appeals from a judgment that dissolved petitioner's domestic relationship with respondent. Among other things, the judgment divided the parties' property and awarded their primary asset, their previously shared home, entirely to respondent (less some set offs that are not in dispute before us). Because the evidence does not support a reasonable inference that the parties intended that respondent would receive the entirety of the home in a property division, we conclude that the trial court abused its discretion and reverse and remand for the trial court to reconsider the division of the parties' real property.
We first address our standard of review. Because an action to dissolve a domestic partnership is an equitable proceeding, Branam and Beaver , 225 Or. App. 630, 634, 202 P.3d 886 (2009), we have discretion to review the facts and record de novo . ORS 19.415(3)(b). However, petitioner has not sought de novo review, and this is not the *726 type of exceptional case where we would exercise our discretion to engage in such a review. Staveland and Fisher , 295 Or. App. 210, 212, 433 P.3d 749 (2018), rev. allowed , 364 Or. 723 (2019) ; see also ORAP 5.40(8)(c) (stating that we will exercise our discretion to review de novo "only in exceptional cases"). "Consequently, we are bound by the trial court's express and implicit factual findings if they are supported by any evidence in the record." Staveland , 295 Or. App. at 212, 433 P.3d 749 (citations and internal quotation marks omitted). We review a trial court's division of property in the dissolution of a nonmarital domestic relationship for an abuse of discretion. Id . at 218, 433 P.3d 749.
Petitioner and respondent participated in a religious wedding ceremony in California in 1993. The parties, however, decided not to obtain a California wedding license. Petitioner's father, a self-ordained minister who performed the marriage ceremony, told respondent that a marriage license was unnecessary because "marriage is between God and the couple" and incorrectly informed her that she and petitioner would be legally married in any event because Oregon had common-law marriage.
*571 During the ceremony, the couple exchanged vows and signed a covenant. Petitioner vowed that he would "love, honor, and care for" respondent. In return, respondent vowed that she would "love, honor, and obey" petitioner. The parties also exchanged traditional vows that they would "take" each other as "wedded husband" and "wedded wife," "to have and hold from this day forward. For better, for worse; for richer, for poorer; in sickness and in health; to love and to cherish 'til death do us part." The written marriage covenant stated that "Groom [petitioner], and Bride [respondent] before God and witnesses were united in Holy Matrimony." The covenant was signed by petitioner, respondent, the minister, and 10 witnesses.
For 21 years following that ceremony, petitioner and respondent presented themselves to their community as a married couple. They cohabitated, had three children (only one of whom was still a minor at the time of dissolution), and listed their tax status as married when preparing their tax forms, which were sometimes filed jointly and sometimes separately.
For the duration of their partnership, the parties divided duties of work and family life. Petitioner worked outside the home as a general contractor. Respondent maintained the parties' home, raised the children, and, for a time, homeschooled them. Respondent testified that her work at home included cooking, cleaning, laundry, shopping, gardening, and helping to build the family home. She did "everything" when it came to household chores. In doing so, she sacrificed opportunities for further education or to obtain other job skills. Respondent also held various jobs outside the home to supplement the family income, including working at an auto parts store, as a secretary and data entry clerk, and as a teacher's assistant. The parties maintained that general arrangement for 21 years.
With regard to the parties' family home, petitioner had saved approximately $50,000 prior to the marriage ceremony, and, of that amount, he used $24,000 as a down payment for the property on which they would later build the home. Petitioner also invested approximately $25,000 for supplies to build a barn on the property. Petitioner built the *572 family home on the property, and respondent worked along-side petitioner in that effort. The couple also titled the deed to their home as "a married couple." Respondent presented expert testimony that the home was appraised at some point before trial at $488,900.
The parties permanently separated in October 2014, when petitioner left the family home. After he left, petitioner continued to pay for respondent's and the children's living expenses. Petitioner and respondent decided to divorce in early 2015. At some point after that decision, the parties learned from their attorneys that, because they did not have a state marriage license, they were not legally married. Petitioner testified that, after he learned that he and respondent were not legally married, he believed he no longer had an obligation to support her. In the fall of 2015, petitioner significantly reduced the amount of support that he paid for respondent's *727 household and personal expenses but continued to pay child support.
Petitioner petitioned for custody of the parties' minor child and dissolution of their domestic partnership. Respondent counterclaimed for breach of a claimed contract of marriage. Respondent's counterclaim is based, in part, on the premise that petitioner breached his vows to support her when he stopped fully supporting her in the fall of 2015.
Based on these facts, the trial court concluded that petitioner had breached an express and implied contract of marriage and that, as damages for that breach, respondent should be awarded the entirety of their family home (less a set off of $24,000 for petitioner's initial down payment that came from his premarriage-ceremony funds and other smaller set offs not at issue). It appears that the court awarded the entirety of the home to respondent because, among other reasons, it was the parties' largest asset and the court questioned whether it had authority to award spousal support in a case involving a domestic partnership that did not result in a legal marriage. The court reasoned as follows in a letter opinion:
"In summary, this is a marriage just like any other, except for the marriage license. *** [U]nder normal *573 circumstances, this would be a case where [respondent] would certainly be entitled to significant spousal support.
"Assuming that the Court of Appeals has ruled that spousal support is not allowed, in a domestic partnership case (and not in a partition case), and that is an unbending principle even though the facts in Brazell v. Meyer , [42 Or. App. 179, 600 P.2d 460 (1979) (rejecting spousal support in a domestic partnership) ], are different than the facts in this case; then the respondent has advanced several arguments that she should, nevertheless, be entitled to spousal support and/or damages."
The court also concluded that it was more appropriate to award respondent the house because respondent had testified that, "if she were awarded typical spousal support in periodic payments, she has been informed by petitioner that he would not pay those; and because he is self-employed, it would be difficult for her to collect subsequent payments." Thus, the court awarded the family home to respondent apparently as a substitute for an award of spousal support. The court specifically ruled, however, that respondent was not entitled to an award of on-going spousal support.
Instead, the trial court ruled in favor of respondent on her breach of contract counterclaim, finding that petitioner breached a contract that was formed by the parties' vows, the signed covenant, and subsequent conduct. The contract, according to the trial court, had elements of an express contract, an implied contract, and a quasi-contract that was "established by the parties' conduct through the years." The trial court concluded that the vows spoken at the ceremony created the terms of the contract:
"[A] party who has contributed services to a relationship may attempt to recover for the value of the services under one of three theories-express contract, implied-in-fact contract, or a quasi-contract.
"* * * * *
"The express contract, is the 'marriage covenant' document, that the parties and witnesses signed on the date of their marriage and the oral wedding vows, including petitioner's pledge, at the marriage ceremony to 'love, honor, *574 and care for' the respondent. (emphasis added). Finally, the conduct of the parties, as mentioned above, is in every way consistent with a true married couple."
The trial court relied on McHenry v. Smith , 45 Or. App. 813, 609 P.2d 855 (1980), to determine that there was a contract created between the parties. In McHenry , we held that a contract between an unmarried couple that "contemplated all the burdens and amenities of married life" is enforceable. Id . at 816, 609 P.2d 855 (internal quotation marks omitted). The court further concluded that petitioner breached the contract when petitioner stopped making full payments for household bills to respondent and when he repudiated the contract by asserting he was never legally married to respondent, because he "understood [that] he had an obligation to care for the respondent, in good times and in *728 bad times, according to his wedding vows." The court awarded to respondent, as damages, "the real estate free and clear of any interest by petitioner except for the setoffs * * *."
On appeal, petitioner assigns error to the trial court's ultimate division of the parties' real property. Petitioner contends that the court incorrectly made each of the following legal conclusions in reaching its decision: (1) that the parties formed an enforceable marriage contract; (2) that petitioner breached the contract when he "significantly reduced the amount of support he paid to respondent" and "assert[ed] that he was never legally married to respondent"; and (3) that respondent was entitled to damages for the breach in the form of the parties' family home "free and clear of any interest by petitioner." Petitioner contends that, applying the principles in Beal and Beal , 282 Or. 115, 577 P.2d 507 (1978), the parties' home should be divided equally between them. Respondent concedes that the principles in Beal apply to this case but contends that those principles support awarding the entirety of the value of the home to respondent (less the set off of $24,000 to petitioner that is not disputed). As we explain below, we accept the parties' concession that Beal controls the outcome of this case and conclude that, even accepting the trial court's explicit and implicit findings of fact, the court abused its discretion in concluding that those facts support an award of the entirety of the parties' home to respondent.
*575 We start our analysis with the law that applies when partners, like the parties here, have not entered into a legal marriage, but have entered into a domestic partnership. In the mid-1970s, the Oregon Supreme Court recognized the need to address the absence of law protecting unmarried partners and their assets. In Latham and Latham , 274 Or. 421, 427, 547 P.2d 144 (1976), the Oregon Supreme Court held that an express agreement between unmarried partners to share equally in the real and personal property accumulated during the domestic partnership was not void as against public policy. It abrogated prior law that refused to recognize such contracts. Id .
The Supreme Court again considered how to divide property between unmarried partners in Beal . In that case, the parties had jointly entered into a land-sale contract to acquire a home together during their relationship and had lived in the house together for about two years. 282 Or. at 117, 123, 577 P.2d 507. Unlike in Latham , however, there was no express agreement between the parties that contemplated how to divide their assets if they separated. The trial court decided to award each party an equal undivided interest in the property. Id .
On review, the Supreme Court affirmed the equal division of the property during the time that the parties jointly lived there and applied a set off to that division to account for one partner's larger down payment on the property. Id . To reach that decision, the court looked to traditional contract principles to determine the parties' intent regarding the distribution of their assets should they separate:
"We believe a division of property accumulated during a period of cohabitation must be begun by inquiring into the intent of the parties, and if an intent can be found, it should control that property distribution. While this is obviously true when the parties have executed a written agreement, it is just as true if there is no written agreement. *** Thus, absent an express agreement, courts should closely examine the facts in evidence to determine what the parties implicitly agreed upon. ***
"More often than not, such an inquiry will produce convincing evidence of an intended division of property, but we *576 recognize that occasionally the record will leave doubt as to the intent of the parties. In such cases, inferences can be drawn from factual settings in which the parties lived. Cohabitation itself can be relevant evidence of an agreement to share incomes during continued cohabitation. Additionally, joint acts of a financial nature can give rise to an inference that the parties intended to share equally. Such acts might include a joint checking account, a joint savings account, or joint purchases.
"* * * * *
*729 "In summary, we hold that courts, when dealing with the property disputes of [partners] who have been living together in a non-marital domestic relationship, should distribute the property based upon the express or implied intent of those parties."
Id . at 122-23, 577 P.2d 507 (citations omitted). To determine the parties' intent in Beal , the court considered their conduct during their relationship, including their pooling of their resources for their common benefit; their financial arrangements that indicated a sharing of resources, which included a joint saving account; and their combined living arrangements. Id . We also consider as relevant to the parties' implicit intent, "among other things, whether the parties held themselves out to the community as married, how title to the property was held, and the parties' respective financial and nonfinancial contributions to their assets." Staveland , 295 Or. App. at 217-18, 433 P.3d 749.
Over 40 years later, Beal and its progeny remain the controlling law for the distribution of assets acquired during a domestic partnership. We recently applied Beal in Staveland , a case, like this one, involving the division of assets, including real property, between an unmarried couple who had dissolved their domestic relationship, which they had treated much like a marriage. We noted that Beal was decided when we regularly applied de novo review to equitable appeals, which is no longer the case, and, as a result, it was not clear what legal standard of review we applied to the facts. Staveland , 295 Or. App. at 218, 433 P.3d 749 ; ORS 19.415(3)(b) (providing that we may, in our sole discretion, choose to exercise de novo review in appeals of equitable actions). We concluded that where, as here, we do not exercise our *577 discretion to conduct a de novo review, we accept the trial court's explicit and implicit findings of fact that are supported by the evidence, and we consider whether the trial court abused its discretion. Staveland , 295 Or. App. at 212, 218, 433 P.3d 749. As Staveland put it, we consider whether the trial court could "reasonably infer" from the facts that the parties intended to divide their assets. Id . at 220, 433 P.3d 749. The trial court "may exercise its equitable powers to reach a result that is fair under all of the circumstances." Id . at 218, 433 P.3d 749 (citations and internal quotation marks omitted).
As noted, the parties before us concede that Beal controls the outcome of this appeal. That concession is sound because the parties, although they initially mistakenly believed that they were legally married, were in a domestic partnership. We therefore turn to an application of the principles in Beal , applying the standard of review set forth in Staveland .
As the trial court correctly recognized, this case has aspects of an express agreement-to the extent that the vows express an agreement-and aspects of an implied agreement, which is reflected in the parties' conduct during their domestic relationship. Turning to the vows and marriage covenant, the trial court placed significant weight on petitioner's vow to "love, honor and care for" respondent, and particularly on his vow to care for her. The trial court noted that petitioner's ongoing support payments to respondent immediately after the parties' separation further supports the notion that petitioner's vow to care for respondent included providing for her financial care. The trial court concluded that petitioner had breached that vow when he unilaterally reduced the support payments to respondent at some point after discovering that the parties were not legally married.
Turning to the parties' conduct that may reflect their intent on their sharing of income and assets, the trial court found, and there is evidence to support the finding, that the parties had treated their relationship as a marriage and agreed on a particular division of the family responsibilities. As set out above, petitioner and respondent agreed that petitioner would work outside the home, while *578 respondent took care of the home and children and, on occasion, took work outside the home to supplement the family income. As noted, the parties filed taxes as a married couple, sometimes jointly and, at other times, separately.
With regard to the family house, petitioner invested funds that he had saved prior to the parties' marriage ceremony as a down payment on the property and for improving the *730 property. However, both parties worked to build the house on the property, lived in the house and raised a family there together, and they titled the deed to the property in both of their names as a "married couple."[1]
Based on those facts, it was not reasonable for the trial court to infer that the parties either explicitly or implicitly intended for respondent to receive the entirety of the house that they had jointly built, titled, and shared as a family during their long partnership. Under Beal , a court must look to the express and implied conduct of the parties during the domestic partnership to determine the parties' intent as to how joint property would be distributed upon their separation. 282 Or. at 122-23, 577 P.2d 507. Here, the parties' conduct does not support a reasonable inference that the parties intended that respondent would be entitled to the family home "free and clear" of any interest of petitioner. Nor does petitioner's conduct of voluntarily providing financial support to respondent after the parties permanently separated indicate an intention formed by the parties during their partnership that respondent would be entitled to the entirety of their largest asset. From those facts, it is not reasonable to infer that the parties intended that respondent was to retain the entire value of the parties' joint home should their relationship end.
We have previously recognized that Beal does not require a "mechanistic application" that ignores the nature of the parties' relationship and their contributions and sacrifices in a long-term nonmarital relationship. Shuraleff v. Donnelly , 108 Or. App. 707, 712-15, 817 P.2d 764 (1991) ; see also *579 Wilbur v. DeLapp , 119 Or. App. 348, 352, 850 P.2d 1151 (1993) (concluding, on de novo review and application of principles in Beal , that the plaintiff should be awarded half of the value of the defendant's PERS account and recognizing that the plaintiff had not accumulated retirement funds of her own due to her primary role as homemaker and her separate contribution to the defendant's career and the couple's standard of living). We do not foreclose the possibility that, on this record, a trial court might reach a division of the assets that is not equal, and it may recognize substantial nonmonetary contributions to the acquisition and growth of the value of the parties' assets. However, we conclude that the trial court abused its discretion when it effectively gave petitioner no interest in the parties' largest asset (even in light of the division of other smaller assets that are not currently in dispute) because the court could not reasonably reach that conclusion based on the facts in the record.
In addition, petitioner's vows do not reflect an express promise by petitioner to provide respondent with their home should their relationship terminate. This case is distinguishable from McHenry , in which we affirmed the trial court's award of damages for a breach of a cohabitation agreement. In McHenry , the unmarried partners had an express agreement regulating their economic affairs that one party breached. The plaintiff alleged that she and the defendant had an express agreement wherein the plaintiff
"promised to 'work and support defendant and to render her services as companion, cook, homemaker, gardener, and housekeeper to him.' In return, [the defendant] 'agreed to write a German textbook or teaching manual and upon reestablishing his professional career, to work and support [the] plaintiff and to render his services as companion, advisor, caretaker and counselor to her.' "
45 Or. App. at 815, 609 P.2d 855. During their relationship, the parties acquired a property that was deeded only in the defendant's name. Id . at 818, 609 P.2d 855. The plaintiff found employment and worked throughout most of her relationship with the defendant while he worked at a few temporary jobs, but he also focused on completing his German textbook. Id . Once the defendant completed his textbook, he reneged on the plan to provide a deed to the plaintiff for half of the real estate and *580 refused to support *731 her financially going forward. Id . The trial court concluded that the plaintiff's contract claim could proceed to a jury, and, on appeal, we affirmed that ruling. Id . at 815-16, 818-19, 818 n. 2, 609 P.2d 855.
Here, unlike in McHenry , respondent did not prove that the parties had an enforceable agreement regarding the distribution of their income and jointly acquired property. As set out above, the facts, as found by the trial court, do not support a reasonable inference that the parties' intended that the house would be distributed solely to respondent.
Finally, we briefly address the issue of "spousal support." See ORS 107.105(1)(d) (providing that a court may provide "spousal support" in a judgment for "marital annulment, dissolution or separation"). In Brazell , a case involving a domestic partnership, we stated in a footnote that the trial court had correctly determined that it lacked authority to grant spousal support. 42 Or. App. at 182 n. 1, 600 P.2d 460. The text of the opinion concerned how to divide the real and personal property of an unmarried couple. Outside of the passing reference in that footnote, the opinion does not indicate that the issue of spousal support was before us on appeal, and we resolved only the disputed issues concerning the proper division of the parties' property, namely their home and automobile. Cf. Stufflebean v. Brown , 147 Or. App. 347, 349, 935 P.2d 482 (1997) (explaining Brazell and stating that the attorney fee provision in ORS 107.105(5) does not apply to an action for equitable division of property of an unmarried couple because it only applies to actions for annulment or dissolution of a marriage or a separation in a marriage); Wilbur , 119 Or. App. at 351, 850 P.2d 1151 (noting that, because Oregon does not recognize common-law marriage, property of an unmarried couple was not subject to statutes governing dissolution of marital property). Here, we are also not called upon to address a trial court's authority to award spousal support at the termination of a domestic partnership, as that issue is not before us. As explained above, the trial court here did not award spousal support.[2]
*581 Ultimately, the trial court erred in failing to properly apply Beal , as further clarified in our case law, to the facts of this case as found by the trial court. While we leave for the trial court to determine in the first instance whether Beal requires an equal division in this case based on the parties' intent, we conclude that, applying the principles in Beal , the trial court abused its discretion in giving respondent nearly 100 percent of the value of the parties' home. We remand to the trial court to reconsider its division of the family home consistent with this opinion and according to the principles stated in Beal .
Portion of general judgment relating to real property division reversed and remanded; otherwise affirmed.

There appear to have been several deeds to the property during the parties' relationship. An early deed, prior to the wedding ceremony, refers to the parties' title as joint tenants with right of survivorship. A later deed refers to the parties' title as "tenants in common," but refers to them as "a married couple."

The trial court also awarded child support to respondent to be paid by petitioner. That award is not at issue in this appeal.